# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-05-00246-CV

Navasota Resources, Ltd., Appellant

v.

Heep Petroleum, Inc. and Larry W. Kimes, Appellees

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. 97-01738, HONORABLE PETER M. LOWRY, JUDGE PRESIDING

## C O N C U R R I N G   O P I N I O N

I concur in the majority opinion and write to set forth additional reasoning. In this accelerated, interlocutory appeal, appellant Navasota Resources, Ltd., challenges the trial court's denial of its special appearance. The lawsuit underlying this appeal involves the investment and exploration activities of numerous parties in oil and gas leases for property primarily located in Montana and North Dakota and was brought by appellees Heep Petroleum, Inc., Caiman Exploration Co., Boone H. Heep, III, and Larry W. Kimes[1] in Travis County district court against Navasota and

---

[1] Because the interests of these parties coincide for the purposes of this appeal, any reference to Heep Petroleum is to the plaintiffs-appellees unless otherwise specified. References to Heep are to the individual plaintiff-appellee.

others[2] for breach of contract, breach of fiduciary duties, fraud, conversion, and tortious interference with a contract.  Because I find sufficient evidence in the record to support the trial court's exercise of jurisdiction, I would affirm the trial court's order denying the special appearance.

## BACKGROUND

Appellant Navasota is a diversified Canadian company participating in the drilling of oil and gas wells.  The company is listed on the Vancouver Stock Exchange.  Boone Heep, III, ("Heep") is the president and chief executive officer of Heep Petroleum, Inc., a Texas corporation located in Austin, Texas.  Heep Petroleum is in the business of generating oil and gas projects and is also an independent producer that sometimes purchases production.

Heep first became acquainted with Navasota in the summer of 1993 when he met Jim Simpson, head of corporate development for Navasota, at a barbeque event at an oil well located in Fayette County.  Navasota had invested in several properties located in Texas, including leases in Fayette County, through operator Edco Energy, an Austin company.  In the fall of 1995, Heep was formally introduced to Simpson at a mutual friend's home in Austin.  At that meeting, Simpson told Heep that Simpson was looking for oil and gas projects on behalf of Navasota.  Heep discussed with Simpson an oil and gas project known as the Williston Basin joint venture located in Montana that forms the basis of this lawsuit.  Simpson expressed an interest.

---

[2] The remaining defendants in the underlying lawsuit include Rufus C. Mathews, Jr., Charles F. Weller, Discovery Exploration, Inc., Advanced Technology Oil & Gas, Inc., High Plains Associates, Inc., Steven W. Weller, Douglas J. Kirn, and Richard D. Dolecek.

On October 19, 1995, Simpson met with Heep and Steve Weller at an associate's Austin real estate office. Weller was the owner and president of Advanced Technology Oil and Gas, Inc., a Texas corporation ("Advanced Technology"), and a partner in the joint venture. At the meeting, Weller, a geologist who put the joint venture together, made a presentation to Simpson about the project. At the conclusion of the meeting, Simpson called Navasota's president, Bill Sanesh, and explained the deal to him. After the telephone conversation, Simpson told Heep, "We'll take the deal." The parties then drafted a letter of intent based on the negotiations at the meeting.

By letter dated November 2, 1995, on behalf of "Steve Weller and myself," Heep thanked Simpson for the meeting and advised him that they were "looking forward to working with you and Navasota Resources on the Williston Basin Project as we feel it will be a successful and profitable venture for all involved." Heep advised Simpson that he and Weller had executed the letter of intent and forwarded it to Richard Dolecek of Discovery Exploration, Inc. ("Discovery") and then to Simpson for execution by Navasota. Heep concluded the letter, "Please tell Mr. Sanesh I enjoyed visiting with him and we look forward to our next meeting." Dated November 1, the letter of intent was circulated and executed by all the parties. The signatories to the letter were Bill Sanesh of Navasota, Weller of Advanced Discovery, Heep of Heep Petroleum, and Dolecek of Discovery. Sanesh was identified as the "Participant or Participant's nominee" in the "proposed Texas joint venture" to be comprised of Discovery, Advanced Technology, and Heep Petroleum.[3]

---

[3] Both Advanced Technology and Heep Petroleum are Texas corporations. Discovery is a Colorado corporation.

On December 1, 1995, the same parties entered into a Participation and Exploration Agreement, setting forth the terms of the joint venture. Sanesh executed the agreement on behalf of Navasota as its president. The agreement included a choice-of-law provision, stating that the laws of the State of Texas would "govern the determination of the validity of this Agreement, the construction of its terms, and the interpretation of the rights and remedies of the parties." The agreement also provided for binding arbitration and designated the Texas General Arbitration Act to control any controversy that might arise.

At about the same time, the parties entered into a compensation agreement with the same choice-of-law and arbitration provisions as the participation and exploration agreement. The agreement was executed on January 17, 1996, but was effective as of November 15, 1995. The agreement between Discovery, Advanced Technology, and Heep Petroleum specified the compensation that Discovery and Advanced Technology would pay Heep for their introductions to Navasota and another Canadian company, Roulette Resources, Ltd., "relative to the Participation and Exploration Agreements."

Meanwhile, in December 1995, Navasota acquired a 25% non-operating working interest in the joint venture and Roulette acquired the remaining 75% interest. An amendment to the agreement was executed by the parties on February 1, 1996. The executed amendment was forwarded by Navasota's attorney to Heep in Austin to arrange for execution of the amended agreement by both Heep Petroleum and Advanced Technology.

On February 6, 1996, Navasota and Heep Petroleum entered into a participation and exploration agreement for the Big Waully Prospect, an oil and gas development project in North

4

Dakota. Navasota agreed to purchase a ten percent leasehold interest. A payment schedule provided for payments in February and March 1996 to Amarado Oil Company, a Texas company located in Austin.

The lawsuit at issue primarily involves the investment and exploration activities of numerous parties in the Williston Basin joint venture. The dispute began in 1997 when Heep, Heep Petroleum, Caiman Exploration Co.,[4] and Larry Kimes, the vice president of Heep Petroleum to whom Heep had assigned an interest, sued Rufus Mathews and Charles Weller,[5] both residents of Harris County, who had engaged in joint efforts with Heep to invest in and market various oil and gas projects, including the Williston joint venture. The original petition related to the compensation agreement and concerned the compensation to be paid to Heep for introducing Navasota and Roulette to Advanced Technology and Discovery.

As a result of the growing dispute and a realignment of business partners, in 1998 Navasota and Discovery executed an exploration agreement recognizing, according to Navasota's brief on appeal, "the continuing validity" of Heep Petroleum's interest under the 1995 participation and exploration agreement. Specifically, the agreement recited the settlement of a dispute between Navasota and Discovery and the continuing existence of a dispute between Navasota, Discovery,

---

[4] Caiman Exploration Co. was incorporated by Heep in October 1993 under the name Logic Energy & Exploration, Inc.; it changed its name to Caiman Exploration Co. in May 1996.

[5] Charles Weller is Steve Weller's brother.

5

Heep, and other parties. With regard to the choice-of-law provision, the parties to the exploration agreement selected the State of Colorado and also consented to venue and jurisdiction in Colorado.

In 1999, the Heep Petroleum plaintiffs amended their petition to join Navasota, Advanced Technology, Discovery, Steven Weller, Dolecek, and two other parties, seeking a declaratory judgment "for construction of several contracts between the various parties" and various causes of action seeking damages, including claims for breach of contract, breach of fiduciary duty, fraud, conversion, and tortious interference with contract. The Heep Petroleum plaintiffs also sought the imposition of a constructive trust and an accounting.

In response, Navasota filed a special appearance, asserting that it was not subject to personal jurisdiction in Texas. After a hearing, the trial court overruled the special appearance, determining that the company is subject to jurisdiction in Texas. Navasota appeals the trial court's order.

## ANALYSIS

Navasota contends that the trial court erred in denying its special appearance because Navasota did not have sufficient minimum contacts with Texas for a Texas court to exercise personal jurisdiction over it. Specifically, Navasota urges that, because the agreements concerned the development of oil and gas leases in Montana and North Dakota, the trial court improperly exercised jurisdiction. In its special appearance objecting to jurisdiction, Navasota asserted that (i) Navasota is not and has never been a Texas resident; (ii) Navasota does not now engage and has not engaged in business in Texas nor committed any tort in the State; and (iii) Navasota does not maintain a place of business in Texas and has no employees, servants, or agents within the State.

6

*Burden of Proof and Standard of Review*

The Texas long-arm statute authorizes exercise of jurisdiction over a nonresident who "does business" in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 1997). The plaintiff has the initial burden to plead sufficient allegations to bring a non-resident defendant within the personal jurisdiction of a Texas court. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002). The nonresident defendant bears the burden of negating all bases for personal jurisdiction alleged by the plaintiff. *Id.* (citing *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985)). Whether a court has personal jurisdiction over a defendant is a question of law, which we review *de novo*. *Marchand*, 83 S.W.3d at 794.

The trial court frequently must resolve questions of fact before deciding the jurisdictional question. *Id.* When, as here, the trial court does not issue findings of fact and conclusions of law with its ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Id.* at 795. However, in cases in which the appellate record includes both the reporter's and clerk's records, as it does here, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id.*

A legal sufficiency challenge will fail if there is more than a scintilla of evidence to support the finding. *Id.* More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 548 (Tex. App.—Houston [14th Dist.] 2003, no pet.). A factual sufficiency challenge requires proof that the trial court's ruling was so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.

7

*Goodenbour v. Goodenbour*, 64 S.W.3d 69, 75 (Tex. App.—Austin 2001, pet. denied). In conducting this review, we consider the entire record, not just the evidence in support of the challenged fact. *Walker Ins. Servs.*, 108 S.W.3d at 548. In reviewing the record, we are mindful that we must not address the merits of the case. Issues of liability are separate inquiries, and are properly reserved for a full trial on the merits. *Id.* at 549.

### *Personal Jurisdiction*

Two conditions must be met for a Texas court to exercise personal jurisdiction over a non-resident defendant: the Texas long-arm statute must authorize the exercise of jurisdiction, and the exercise of jurisdiction must be consistent with the guarantees of due process. *Marchand*, 83 S.W.3d at 795; *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990).

The Texas long-arm statute allows a Texas court to exercise personal jurisdiction over a non-resident defendant that does business in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042. A non-resident does business in Texas if it (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; (2) commits a tort in whole or in part in this state; or (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state. *Id*. In addition, the statute provides that "other acts" by the non-resident can satisfy the requirement of "doing business" in Texas. *Id*.; *see also Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex. 1991).

Because the language of the long-arm statute is broad, its requirements are considered satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *CSR*

*Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). The cornerstone of due process in the context of personal jurisdiction is the minimum-contacts analysis. *Schlobohm*, 784 S.W.2d at 357. The goal of this analysis is to protect a defendant from being unjustifiably called before the courts of a foreign state. *Id*. To establish minimum contacts with a state, the defendant "must do something purposeful to avail himself of the privilege of conducting activities in the forum, thus invoking the benefit and protection of its laws." *Id*.; *see also Burger King v. Rudzewicz*, 471 U.S. 462, 474-76 (1985).[6] A defendant should not be subject to the jurisdiction of a Texas court based upon random, fortuitous, or attenuated contacts. *CSR Ltd.*, 925 S.W.2d at 595. The purposeful availment requirement ensures that the non-resident defendant's contact must result from its purposeful contact, not the unilateral activity of the plaintiff or a third party. *See Guardian Royal*, 815 S.W.2d at 227. It is the quality and nature of the contacts, rather than their number, that is important. *Id*. at 230 n.11. The exercise of personal jurisdiction is proper when the contacts proximately result from actions of the non-resident defendant that create a substantial connection with the forum state. *Id*. at 226. We also inquire whether the defendant's conduct and connection with the forum state is "such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

The terms of the agreements at issue must also be evaluated to determine whether the defendant purposefully established minimum contacts with the forum. *See Burger King*, 471 U.S.

---

[6] "So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King*, 471 U.S. at 475 n.18. *See also Holk v. USA Managed Care*, 149 S.W.3d 769, 774 (Tex. App.—Austin 2004, no pet.) (three telephone calls over four years to forum state to solicit customer for fishing boat charter along the Gulf coast).

at 479. Merely contracting with a Texas corporation does not satisfy the minimum-contacts requirement. *Id*. at 478. Nor is the making of payments in Texas alone sufficient to establish minimum contacts. *U-Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760, 763 (Tex. 1977), *cert. denied*, 434 U.S. 1063 (1978). When, as here, the foreign defendant has contact with the forum by virtue of the formation of a contract, prior negotiations and contemplated future consequences, the terms of the contract and the parties' actual course of dealing must be evaluated to determine whether the defendant purposefully established minimum contacts within the forum. *Burger King*, 471 U.S. at 479.

Personal jurisdiction exists if the non-resident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413-14 & nn. 8-9 (1984). Specific jurisdiction is established if the non-resident defendant's alleged liability arises from or is related to the defendant's purposeful contact with the forum. *Helicopteros*, 466 U.S. at 414 & n.8. When specific jurisdiction is asserted, the minimum-contacts analysis focuses on the relationship among the defendant, the forum, and the litigation. *Guardian Royal*, 815 S.W.2d at 227-28. It is not necessary that a non-resident defendant's conduct actually occur in Texas, as long as the defendant's acts were purposefully directed toward the state. *CSR Ltd.*, 925 S.W.2d at 595. A defendant should reasonably anticipate being haled into court when the effects of its conduct have been intentionally caused through the purposeful direction of activity toward the forum state, even if the defendant never physically enters the state. *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 248 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). General jurisdiction is present when a defendant's contacts are continuous and

10

systematic, allowing the forum to exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Guardian Royal*, 815 S.W.2d at 228. General jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum-contacts analysis than for specific jurisdiction. *Id.*

A court must determine a "special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." Tex. R. Civ. P. 120a(3). Although Navasota argued that it had no contacts with the State of Texas, the record convinces us otherwise.

### 1. Specific Jurisdiction

We first review the record regarding Navasota's contacts with Texas to determine whether they are sufficient to establish specific jurisdiction. In this case, the evidence shows that Navasota has purposefully established minimum contacts with Texas. Two essential contracts relating to the investment and exploration activities of the parties support the exercise of jurisdiction: (i) the compensation agreement and (ii) the participation and exploration agreement with amendments. The contracts originated in Texas with Texas participants and arose from Simpson's travels to Texas and through mail and facsimile transmissions directed to Texas participants. It is the terms of the joint venture formed at the Texas meeting that are the basis of the lawsuit. As a consequence of disagreements between Navasota and Heep Petroleum regarding their rights and duties under the agreements, Heep Petroleum sued Navasota asking for, among other things, a

11

declaratory judgment defining the rights of the parties involved. In addition, as set forth below, correspondence between Navasota in Canada and Heep Petroleum and Advanced Technology in Texas, substantial payments directed to Texas, and choice-of-law agreements between the parties provide the required nexus to the state.

In its live pleading on file when the trial court decided the special appearance, Heep Petroleum, a Texas resident, alleged that Navasota "engages in business in Texas" and that its causes of action arose from its "written contracts" and transactions with Navasota, Discovery, and Advanced Technology that occurred or were consummated in Travis County. Two of these parties to the 1995 agreement, Advanced Technology[7] and Heep Petroleum, were Texas entities and Navasota's participation in the joint venture allegedly originated at the meeting in Austin that resulted in the letter of intent. Simpson participated in the presentation, sought the approval by Navasota's president at the conclusion of the meeting, and confirmed the company's agreement to the joint venture. The letter of intent was executed by Advanced Technology and Heep Petroleum in Austin and forwarded to Discovery and Navasota for execution.

Navasota presented no testimony by witness or affidavit. To meet its burden to negate all potential bases of jurisdiction, Navasota offered into evidence at the hearing the following exhibits: Navasota's responses to Heep Petroleum's interrogatories, Heep Petroleum's first amended

---

[7] Heep Petroleum introduced Advanced Technology's articles of incorporation showing that it is a Texas corporation.

answers to Navasota's interrogatories, the 1995 Participation and Exploration Agreement, the Compensation Agreement, a demand for arbitration by Discovery and Navasota against Roulette and two other Canadian companies regarding participation in the Williston Basin joint venture, and a draft participation agreement forwarded to Sanesh as President of Navasota by facsimile on November 22, 1995, with a notation of a copy sent to Simpson.

Heep Petroleum tendered evidence at the hearing to establish both specific and general jurisdiction. Heep testified at the hearing and Heep Petroleum tendered thirty-eight exhibits that were admitted into evidence. Heep testified that after meeting Simpson at the Fayette County barbeque, he was again introduced to Simpson "who would come down to visit Edco Energy." Simpson told Heep that he was looking for oil and gas projects on behalf of Navasota. Heep described the meeting and technical presentation in October 1995 and testified that he overheard Simpson's telephone call with Sanesh. Heep testified that the contracts were drafted based on the discussions at the meeting and Navasota's acceptance of the "deal" at the close of the presentation.

The evidence included various correspondence, sent by mail and facsimile, between Navasota in Canada and Heep Petroleum in Austin. A letter dated February 2, 1996, from Navasota's attorney to Heep in Austin enclosed a draft of the First Amendment to the Participation and Exploration Agreement. The attorney requested that Heep execute the agreement on behalf of Heep Petroleum and arrange for Advanced Technology in Austin to execute the agreement. The exhibits also included (i) evidence of payments of money to Texas partners as directed by Heep and (ii) a participation and exploration agreement between Navasota and Heep Petroleum dated February 6, 1996, for the Big Waully Prospect located in North Dakota providing for Navasota's purchase of

13

a ten percent leasehold interest with scheduled payments to be received by Amarado Oil Company, a Texas corporation located in Austin. [8]

Although Navasota disputed that Simpson was employed by Navasota in October 1995, the evidence showed that Simpson was the head of corporate development for the relevant time period. Heep testified that Simpson stated that he was representing Navasota and looking for opportunities on its behalf. According to a press release, Simpson had been in charge of corporate development for Navasota since June 1995. Navasota acknowledges that Simpson met with Heep in Texas in October 1995 to discuss the joint venture and that Simpson "then successfully solicited Navasota" to invest.

Navasota does not dispute that the agreements between the parties originated at the meeting in Austin, but only disputes Simpson's status or authority. Navasota denies that Simpson was acting as its representative on Simpson's trip to Texas. In its answer to interrogatories admitted into evidence at the hearing, Navasota denied that Simpson was either "an officer or director" when he met with Heep in Texas and further stated, "Navasota is not aware of, and can find no record of Mr. Simpson traveling to Texas on behalf of Navasota for any purpose, but cannot rule out the

---

[8] In a letter dated February 1, 1996, from Heep to Sanesh, Heep confirmed that Navasota had agreed to purchase a ten percent leasehold interest and non-operating working interest in the Big Waully Prospect in North Dakota with an option to purchase an additional ten percent interest with a schedule of two payments to be made to Amarado Oil Company, a Texas corporation, in Austin, Texas. Evidence included a Navasota check dated February 12, 1996, payable to Amarado Oil Company in the amount of $165,822.84; a Navasota check dated February 26, 1996 payable to Amarado Oil Company; a Navasota check dated March 12, 1996, payable to Heep Petroleum and showing receipt by Heep Petroleum and Amarado Oil in Austin; a drilling program for the North Dakota lease dated March 5, 1996, sent by facsimile from Navasota to Edco Energy and Heep Petroleum and showing approval and acceptance by Heep Petroleum and Navasota; and various other facsimile transmissions and correspondence sent from Navasota to Heep Petroleum in Austin.

14

possibility that Mr. Simpson, while an officer or director of Navasota, could have met once or infrequently with Edco Energy, Inc., ('Edco') regarding Navasota's working interest investment in certain Austin Chalk wells." Navasota argues that Heep Petroleum "attempts to infer from Simpson's prior and subsequent status as Navasota's 'Head of Corporate Development' that he was acting in that capacity when he traveled to Texas in October 1995."

Evidence at the hearing included a 1996 Navasota press release that listed Simpson as head of "corporate development" and stated, "His role with the Company is to promote the Company in the United States and to find and develop corporate opportunities." Another undated[9] press release again identified Simpson as head of corporate development, referenced Navasota's participation in the Williston joint venture and Big Waully project, and stated: "The company is also negotiating participation in a 3-D gas program in Goliad County, Texas. The program is designed to target the Wilcox formation and the operator of this program is Edco Energy." A September 1996 release identified Simpson as head of corporate development with extensive experience in the oil and gas and mining industries. At the hearing, Navasota's attorney acknowledged "a dispute over Mr. Simpson's authority and ability to represent Navasota at this time" and asserted that, "He has been affiliated with Navasota, but he wasn't in the Fall of 1995." We need not address the question of whether Simpson had the authority to represent Navasota at the meeting to the extent it may bear on the merits of the dispute.[10] From the evidence adduced at the hearing, the trial court could conclude

---

[9] Its context indicates it was released in early 1996.

[10] Our jurisdictional inquiry merely requires a determination of whether Navasota engaged in purposeful, minimum contacts toward Texas in connection with the underlying dispute. All other issues are properly reserved for trial on the merits. *See Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 554 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (declining to stray into

that Simpson was representing Navasota in his negotiations with Heep Petroleum for the purposes of jurisdiction. Navasota has not met its burden of showing that the implied findings are contrary to the great weight of the evidence, or that the legal conclusions are not supported by a scintilla of evidence in the record.

A choice-of-law provision is also relevant in determining whether a non-resident has subjected itself to the jurisdiction of the forum state. Although a choice-of-law provision is not dispositive of jurisdiction, that the non-resident agreed to be governed by Texas law in matters arising under the contract is a factor in determining whether jurisdiction should be had in the forum state. *3-D Electric Company, Inc. v. Barnett Constr. Co.*, 706 S.W.2d 135, 145 n.9 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). Two of the agreements here specifically provided that the laws of the State of Texas would govern the determination of the validity of the agreement, the construction of its terms, and the interpretation of the rights and remedies of the parties. They also provided that binding arbitration had to comply with and be governed by the provisions of the Texas General Arbitration Act. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 171.001-.098 (West 2005).

This case is similar to *Fish v. Tandy Corp.*, 948 S.W.2d 886, 895 (Tex. App.—Fort Worth 1997, pet. denied). In *Fish*, the court of appeals held that Fish had established minimum contacts with Texas by negotiating and contracting with Tandy Corporation in Fort Worth, even

---

the issue of liability, the court stated that, in deciding the jurisdictional inquiry, "the trial court should rely only upon the necessary jurisdictional facts and should not reach the merits of the case.").

16

though the distributorship agreement was for the distribution of Tandy products in Russia. *Id*. at 894-95. The underlying suit arose when the parties disagreed over their rights and duties under the distributorship agreement. *Id*. at 895. The court held that the contractual dispute arose from Fish's contacts with Texas because the questions about the parties' rights and duties under the agreement were directly linked to Fish's negotiations with Tandy in Texas. *Id*. This case, like *Fish*, involves the negotiation of a contract that was to be largely performed outside of Texas. As the court stated,

> The letter agreement and the distribution agreement were agreements arising directly from the negotiations between Tandy and Fish involving personal visits by Fish to Texas and telephone, mail, and facsimile communications to and from Texas. This is probative and significant evidence that Fish's claims relate to or arise from his contact with Texas, and such a determination is not so contrary to the overwhelming weight of the evidence as to be manifestly wrong.

*Id*. Both cases involve disputes over the parties' rights and duties under their agreements. In the instant case, although the underlying purpose of the contract was to develop oil and gas leases in Montana and North Dakota, the relationship and agreements were formed during Simpson's trips to Texas. The causes of action relate directly to and arise from Navasota's contacts with Texas.

In sum, the evidence considered for purposes of the special appearance shows that the contracts at issue were negotiated by representatives of the companies in Austin and were executed by two of the companies in Austin, that these two companies were Texas corporations, that the lawsuit at issue arose out of the Austin meetings, and that correspondence and payments were directed to Texas entities in the state. We conclude that the quality and nature of the contacts is

17

sufficiently substantial for the trial court to exercise jurisdiction. Although we conclude that Navasota purposefully established minimum contacts with Texas, jurisdiction does not rest on these contacts alone. We turn now to general jurisdiction.

### 2. *General Jurisdiction*

The parties dispute whether it is proper to exercise general jurisdiction over Navasota based on its doing business in the State of Texas. Although in its special appearance Navasota denied that it had ever engaged in business in the State of Texas, once Heep Petroleum produced evidence that it had done so, Navasota was required to negate this basis for jurisdiction with evidence. Navasota argues—without producing evidence at the hearing—that it formally terminated all activities in the State of Texas prior to being served with the amended petition. Because Navasota's contacts were sufficient to support the exercise of general jurisdiction, withdrawal prior to suit does not necessarily eliminate jurisdiction. In any event, because Navasota failed to negate this basis for jurisdiction, I would conclude that the denial of special appearance may be affirmed on this ground as well.

A corporate communications release dated September 1996 and compiled for its shareholders identified Navasota as "a diversified resource company participating in the drilling of oil and gas wells in the Williston Basin of Montana and North Dakota and in Texas and other exploration ventures." Although Navasota denied doing business in Texas, in an answer to interrogatories, Navasota identified eight wells or drilling programs in the State of Texas in which

18

it had non-operating working interests.[11]  These included wells in the counties of Grimes, Fayette, Goliad, Archer, and Webb.

One Navasota press release referenced negotiations for participation in a gas program in Texas commencing in the summer of 1996 and discussed the Williston joint venture, which, the release stated, "should have a positive affect on the cash flow in the fall of 1996."  As to the Williston joint venture, in which Navasota had a 25% working interest, the release further stated, "the program is operated on behalf of the company by Advanced Tech Oil and Discovery Explorations, Inc."  The release then identified Navasota's Texas projects:

> On November 6, 1995, the company announced that Wellman #2 well commenced production.  The well is located in Grimes County, Texas and is operated by Chesapeake Energy (listed on the New York Stock Exchange).  On November 15, 1995, the company negotiated a further acquisition of a working interest in the Wellman #1 . . . .  The Company purchased a 10.9% working interest in Wellman #1 and 15.1% working interest in Wellman #2.  The cash flow is approximately $100,000 US per month and the asset value is $3,054,700 US.  The Company also acquired a 15% working interest in the Ansell #1 well which is operated by Edco Energy Inc. of Austin, Texas.  The Ansell #1 well is located in Fayette County, Texas.  It is a low pressure oil well currently producing between 50 to 120 barrels per day.  Furthermore, the Company is negotiating with Edco Energy Inc. to acquire up to 15% working interest in the Berclair Prospect, also in Texas . . . .  The prospect is located in Southwestern Goliad County along the Bee/Goliad County line.  The large prospective areas coupled with probability of wells over 100' of net prospective reservoirs leads to a possible prospect size up to one trillion cubic feet of gas.

---

[11]  Interests in oil and gas rights, including working interests and royalty interests in oil and gas leases, are considered interests in real property. *See Renwar Oil Corp. v. Lancaster*, 276 S.W.2d 774, 776 (Tex. 1955); *Trutec Oil & Gas, Inc. v. Western Atlas Int'l, Inc.*, No. 14-04-00363-CV, 2006 Tex. App. LEXIS 3225, at *9 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (memo. op.); *MCEN 1996 P'ship v. Glassell*, 42 S.W.3d 262, 263 (Tex. App.—Corpus Christi 2001, pet. denied).

Other Navasota press releases referenced Navasota's working interest in the Diebel #1 well in Goliad County with operator Edco Energy, a second well to be drilled in Goliad County within sixty days after Diebel #1,[12] and Navasota's acquisition of a working interest in a twenty-well drilling program in Webb County, Texas, and in a 5200 foot well in Archer County, Texas.

Navasota argues that its contacts with Texas were not continuous and systematic, and were, therefore, insufficient to establish general jurisdiction. Navasota urges that because its activities in "certain 'Austin Chalk' horizontal drilling programs," involving properties in Grimes, Goliad, Archer, and Webb Counties, do not relate to the lawsuit and were "terminated" prior to Navasota being served with the amended petition, they are insufficient to establish general jurisdiction. Citing *Equitable Production Co. v. Canales-Trevino*, 136 S.W.3d 235, 240-43 (Tex. App.—San Antonio 2004, pet. denied), Navasota urges that its "withdrawal" from Texas should weigh heavily against a finding of general jurisdiction. However, in finding that Equitable's contacts with Texas were sufficiently continuous and systematic to support the exercise of general jurisdiction, the San Antonio court of appeals determined that the company's relocation of its

---

[12] The news release dated October 15, 1996 stated, "The company is pleased to announce that Diebel #1 well in Goliad County, Texas has reached its primary target—the 'Basal Massive' sand in the Wilcox formation . . . . The second well is scheduled to be drilled in approximately 60 days. Forty wells may be required to fully develop the 15,000 acre prospect." A news release dated October 16, stated, "The Diebel #1 well is the first well in a multi-well program operated by Edco Energy of Austin, Texas. The company has purchased an 8.5% Working Interest in this well subject to regulatory approval for $238,404.90 US and 19,867 treasury shares issued at a deemed price of $2.20 Cdn. The 15,000 acre prospect was generated after a 48 square mile 3-D seismic survey, that was interpreted by Schlumberger-GeoQuest. . . . Forty wells may be required to fully develop the 15,000 acre prospect."

20

corporate offices from Texas to Virginia three months before suit was filed was but one factor to consider in assessing the existence of jurisdiction. *Id.* at 242-43.

More importantly, Navasota failed to satisfy its burden to negate this basis for jurisdiction. After asserting that it had never engaged in business in Texas, Navasota failed to respond to the evidence tendered by Heep Petroleum at the hearing. Navasota introduced its own answers to interrogatories showing it had a working interest in at least eight wells or drilling programs from 1993 until some time in early 1999. Navasota did not offer evidence that these activities did not constitute doing business within the state. Nor did it offer evidence that these business activities were random, fortuitous, or attenuated contacts. *See American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). The evidence showed that they were sufficiently systematic and continuous, such that Navasota "purposefully availed" itself of the privilege of conducting activities in Texas and could reasonably have anticipated being haled into a Texas court. *See Burger King*, 471 U.S. at 475.

Because Navasota failed to negate general jurisdiction, I would hold that the trial court did not err in its exercise of jurisdiction.

***Traditional Notions of Fair Play and Substantial Justice***

Under the second prong of the test for due process, a party opposing a non-resident defendant's special appearance must show that the exercise of in personam jurisdiction comports with fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Because the minimum contacts analysis encompasses considerations of fairness, it has become less likely that the exercise of jurisdiction will fail a fair play analysis. *Schlobohm*, 784 S.W.2d at 357-58; *Burger King*, 471 U.S. at 476-77. This analysis is separate and distinct from the

21

minimum-contact issue, though, and must be conducted. *Schlobohm*, 784 S.W.2d at 358. We therefore consider whether, despite the existence of minimum contacts, there are any reasons why our assertion of jurisdiction in this case would offend traditional notions of fair play and substantial justice.

Navasota argues that the burden on the nonresident defendant here is great because Navasota is a Canadian company located in a remote region of British Columbia and the travel expenses are prohibitive. Because the properties at issue in the litigation between the parties are in Montana and North Dakota, Navasota contends that Texas's interest in adjudicating this dispute is minimal: "The only connection to Texas is the fact that Heep is a Texas resident." Nothing in the record shows that litigation in a Texas court would be excessively burdensome or inconvenient to Navasota. Navasota did not offer any evidence at the hearing; it does not identify its representatives, witnesses or the burden entailed. In light of the fact that Simpson traveled at least to Fayette and Travis Counties on various occasions and that the company held leasehold interests in at least five Texas counties, we cannot say that litigating a dispute in the state would be unreasonably burdensome.

Texas has a legitimate interest in adjudicating disputes interpreting its own oil and gas leases. In addition to the choice-of-law provisions implicating Texas law, the State's interest in enforcing its own law is heightened when the case involves a business involving mineral resources in Texas. *Texas Commerce Bank v. Interpol '80 Ltd.*, 703 S.W.2d 765, 773-74 (Tex. App.—Corpus Christi 1985, no writ). Of course, this interest may be less acute when the dispute at issue does not concern Texas properties. *See also Guardian Royal*, 815 S.W.2d at 229 (State's regulatory interest is an important consideration in deciding whether exercise of jurisdiction is reasonable).

Reviewing the record, we find ample evidence to support the trial court's conclusion. We have concluded that the quality, nature, and extent of Navasota's activity in Texas justifies a conclusion that it could expect to be called into Texas courts. Nothing in the record suggests that litigation in a Texas court would be excessively burdensome or inconvenient. The nature of the underlying dispute calls for the application of Texas law designed to protect Texas residents.

We conclude that the due process concerns are satisfied in this case and that the exercise of jurisdiction over Navasota by a Texas court does not offend traditional notions of fair play and substantial justice.

## CONCLUSION

Considering all of Navasota's contacts with Texas, including the relationship between the defendant, the forum, and the litigation, I would hold that the trial court did not err in concluding that Navasota's purposeful contacts with Texas were sufficient to support the assertion of general as well as specific jurisdiction. Moreover, Navasota failed to negate all bases of jurisdiction and did not show that the assertion of jurisdiction by a Texas court would otherwise be unreasonable. I concur in the majority opinion, affirming the trial court's order denying Navasota's special appearance.

_____

Jan P. Patterson, Justice

Before Justices B. A. Smith, Patterson and Puryear

Filed:   June 30, 2006