Arthur HOLK and Andy Holk d/b/a Pleasure Motion, Appellants,

v.

USA MANAGED CARE ORGANIZATION, INC., Appellee.

No. 03–03–00477–CV.

Court of Appeals of Texas, Austin.

July 15, 2004.

Barry K. Bishop, Clark, Thomas & Winters, Austin, for appellants.

William C. Davidson, Minter, Joseph & Thornhill, P.C., Austin, for appellee.

Before Chief Justice LAW, Justices B.A. SMITH and PATTERSON.

## OPINION

BEA ANN SMITH, Justice.

We withdraw our original opinion and judgment of February 12, 2004 and substitute the following opinion in which we grant the motion for rehearing.

USA Managed Care Organization, Inc. (USA) filed suit in Texas against Alabama residents Arthur Holk and Andy Holk, individuals doing business as "Pleasure Motion," for failing to fulfill their agreement to provide the use of the boat "Pleasure Motion" to USA for fishing trips. The Holks filed a special appearance claiming that because they are not residents of Texas and do not engage in business in Texas, and because the activities made the basis of USA's claims did not take place in Texas, they are not subject to the jurisdiction of Texas courts. *See* Tex.R. Civ. P. 120a. After a hearing, the trial court denied their special appearance. The Holks bring this interlocutory appeal of that denial. Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2004). For the reasons set forth below, we affirm the trial court's denial of the Holks' special appearance.

## BACKGROUND

In 1994, USA, a Texas corporation with its principal place of business in Austin,[1] entered into an oral agreement with the Holks, residents of Alabama, to occasionally use their boat the "Pleasure Motion" for fishing trips. Andy Holk operated the boat and his father, Arthur Holk, financially backed his son's operation. It is unclear from the record who initiated the contact; George Bogle, USA's chief executive officer, testified that this agreement probably took place in Pensacola, Florida, and continued until 1998, when this arrangement lapsed. Andy Holk offered to pick up Bogle and his guests anywhere on the Gulf Coast, picking them up once in Louisiana and a few times in Florida. In 1999, Andy Holk called Bogle in Austin to ask if USA

wanted to use the boat again. USA contracted to use the boat in 1999 but not in 2000. In 2001, Andy Holk again called Bogle in Austin to ask if USA wanted to use the boat. USA agreed and used "Pleasure Motion" three or four times in 2001, paying a total of $25,000. Again in 2002, Andy Holk called Bogle in Austin to solicit USA's use of the boat. Holk asked for a $25,000 payment in advance, which USA sent. All of USA's payments for the use of the boat were from its bank account in Texas. USA used the boat for a fishing trip one time for three days in May 2002, incurring charges of $8,494.91.

After the one fishing trip in May 2002, USA attempted several times to contact Andy Holk to schedule additional boat trips. Receiving no response, USA sent a demand letter to Andy Holk for $16,505.09, the balance remaining of its $25,000 prepayment for boat use in 2002. Still receiving no response, USA filed suit against the Holks in Travis County for breach of contract and unjust enrichment. The Holks filed a special appearance, attaching affidavits stating that they are Alabama residents, do not engage in business in Texas, do not actively solicit business in Texas, and do not visit Texas on a regular basis. They further averred that the events giving rise to the claim did not take place in Texas because USA was an Arizona company at the time of the initial contact and the services provided took place in Alabama. The trial court held a hearing on the special appearance, at which Bogle testified and the Holks presented evidence by affidavit. The trial court denied the special appearance, and it is from this denial

---

1. It is unclear from the record whether USA was a Texas corporation at the time of the original agreement between USA and the Holks. At that time, USA may have been a Delaware corporation with its headquarters in Arizona, but it moved its headquarters to Texas sometime in 1994. However, during the relevant actions here-the Holks' solicitation of USA's renewal business-USA was a Texas corporation headquartered in Austin.

that the Holks bring their interlocutory appeal.

## ANALYSIS

### Standard of Review

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 793 (Tex.2002). A defendant challenging the court's assertion of personal jurisdiction must negate all jurisdictional bases alleged by the plaintiff. *American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 807 (Tex.2002). Whether a court has personal jurisdiction over a defendant is a question of law, which we review *de novo. BMC Software,* 83 S.W.3d at 794. However, the trial court frequently must resolve questions of fact before deciding the question of jurisdiction. *Id.* When, as here, the trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment that are supported by the evidence are implied. *Id.* at 795. When the appellate record includes both the reporter's and clerk's records, however, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id.*

### Personal Jurisdiction

The Texas long-arm statute authorizes Texas courts to exercise jurisdiction over a nonresident defendant that does business in Texas. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 17.041–.044 (West 1997), § 17.045 (West Supp.2004). The broad language of the "doing business" requirement in section 17.042 permits the statute to reach as far as the federal constitutional requirements of due process will allow. *Guardian Royal Exch. Assurance,* *Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). Thus, we rely on precedent from the United States Supreme Court and other federal courts, as well as Texas decisions, to determine whether the assertion of personal jurisdiction is consistent with the requirements of due process. *BMC Software,* 83 S.W.3d at 795.

Personal jurisdiction over a nonresident defendant is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). A nonresident defendant that has "purposefully availed" itself of the privileges and benefits of conducting business in the forum state has sufficient contacts to confer personal jurisdiction. *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). A defendant should not be subject to jurisdiction based on random, fortuitous, or attenuated contacts. *Id.* (citing *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174).

The minimum contacts analysis has been refined into two types of jurisdiction-specific and general jurisdiction. Because USA does not contend that general jurisdiction exists, we will confine our discussion to specific jurisdiction. Specific jurisdiction exists when the nonresident defendant's activities have been "purposefully directed" to the forum and the litigation results from injuries arising out of or relating to those activities. *Guardian Royal,* 815 S.W.2d at 228. The minimum contacts analysis for specific jurisdiction is somewhat narrow, focusing on the relationship among the defendant, the

forum, and the litigation. *Id.; Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex. 1990). "It is the quality and nature of the defendant's contacts, rather than their number, that is important to the minimum-contacts analysis." *American Type,* 83 S.W.3d at 806 (citing *Guardian Royal,* 815 S.W.2d at 230 n. 11).

■ Texas employs a three-part test to determine whether there is specific jurisdiction:

(1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state;

(2) The cause of action must arise from, or be connected with, such act or transaction; and

(3) The assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation.

*Schlobohm,* 784 S.W.2d at 358 (citing *O'Brien v. Lanpar Co.,* 399 S.W.2d 340, 342 (Tex.1966)). These requirements ensure that a nonresident will be "haled" into court only as a result of intentional activities, so that it is reasonable for the nonresident defendant to expect the call of a Texas court. *See Guardian Royal,* 815 S.W.2d at 226; *Schlobohm,* 784 S.W.2d at 357–58.

■ At the outset, we reject USA's argument that the Holks waived any jurisdictional defects by failing to file a motion to quash. As USA properly states, a special appearance is "for the purpose of objecting to the jurisdiction of the court over the person or property of the defendant on the ground that such party or property is not amenable to process issued by the courts of this State." Tex.R. Civ. P. 120a. A motion to quash, on the other hand, is the proper vehicle for objecting to jurisdictional defects. *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985). Because the Holks objected to personal jurisdiction, not to jurisdictional defects in USA's pleading, they properly filed a special appearance. We now turn to an examination of whether the defendants were subject to the jurisdiction of a Texas court.

### *Specific Jurisdiction*

■ The first *Schlobohm* prong requires that the Holks have purposefully done some act or consummated some transaction in Texas. *See Schlobohm,* 784 S.W.2d at 358. The relevant facts are that Andy Holk called USA on the telephone three times over four years to solicit its rental of the boat and offered to pick USA up in the boat anywhere along the Gulf Coast.[2]

These facts are similar to those in *Rynone Manufacturing Corp. v. Republic Industries.* The defendant, Rynone, solicited Republic's business over the telephone. 96 S.W.3d 636, 639 (Tex. App.-Texarkana 2002, no pet.). However, Rynone additionally advertised in national trade magazines. *See id.* In *Rynone,* the parties' relationship *began* via a telephone solicitation, whereas here the initiation of the parties' relationship is unclear. We find this distinction insignificant, especially because the Holks and USA's prior arrangement had ceased

---

**2.** The prior arrangement between the parties, ending in 1998, bears little, if any, significance to the determination of whether soliciting USA's renewal business over the telephone was purposefully directed at Texas.

in 1998, and the Holks later renewed a business relationship by soliciting USA's business over the telephone in Texas. The important similarity is that the contracts sued upon in each case were the result of telephone solicitation by the defendants. *See Rynone*, 96 S.W.3d at 640 ("Rynone purposefully called Republic to solicit its business and [ ] this lawsuit ultimately traces back to that telephone call."). The court stated: "Here, Rynone advertised in a national trade publication and *personally solicited Republic over the telephone, an even more purposeful act than advertising in a Texas telephone directory.*" *Rynone*, 96 S.W.3d at 639–40 (emphasis added) (citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434 (Tex.1982)). The *Rynone* court made this conclusion in light of the supreme court's statement in *Siskind* that "Villa's decision to advertise in Texas telephone directories, *in and of itself,* is a sufficiently purposeful act that is done in Texas." *Siskind*, 642 S.W.2d at 436 (emphasis added). If telephone-directory advertising in Texas is enough on its own, and if a phone solicitation is "even more purposeful" than telephone-directory advertising, then the *Rynone* court concluded that personal solicitation over the telephone, *alone,* is a sufficiently purposeful act subjecting the defendant to personal jurisdiction. *See Rynone*, 96 S.W.3d at 640. We agree.

The *Beechem* opinion from this Court also supports the exercise of personal jurisdiction over the Holks. *See Beechem v.*

*Pippin,* 686 S.W.2d 356, 361–62 (Tex.App.-Austin 1985, no writ). There, the out-of-state Pippin solicited a contract over the telephone to lease a machine from Texas-resident Beechem. *Id.* at 361. Pippin also sent payments to Beechem in Texas. *Id.* The Court concluded that by soliciting Beechem's business and partially performing the contract by sending payment, Pippin purposefully availed itself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of its laws. *Id.* at 361–62. "Moreover, it was certainly foreseeable that the contacts might result in litigation, and that the citizens of this State were to some degree put at risk by [Pippin] entering into and performing the contract or not performing it." *Id.*[3]

The *Beechem* court cited *McGee v. International Life Insurance Co.,* in which the United States Supreme Court held that an insurer's act of sending to an insured in California a reinsurance contract was sufficient to subject it to the jurisdiction of the California courts—despite the insurer's never having solicited or done any other insurance business in California. 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), *cited in Beechem,* 686 S.W.2d at 362. We are unable to distinguish the nature of the contacts here from those in *Beechem* and *McGee.*

Cases cited by the Holks for the proposition that simply contracting with a Texas resident is not sufficient are distinguishable. In *TeleVentures, Inc. v. International Game Technology,* 12 S.W.3d 900,

---

**3.** After deciding that Pippin's actions were sufficiently purposeful for Texas to exercise jurisdiction over it, the Court noted other contacts Pippin had with Texas: mail correspondence sent to Beechem, a payment mailed to Beechem's Texas office, Pippin's payment for the transfer of the machine to and from Texas, and Pippin's causing its insurance agent to contact Beechem in Texas to

arrange coverage for the machine. *Beechem v. Pippin,* 686 S.W.2d 356, 362 (Tex.App.-Austin 1985, no writ). However, the Court had already decided the jurisdictional question, mentioning these contacts as an aside. *See id.* Moreover, we find the sum total of all the contacts in *Beechem* no greater or more purposeful than those here.

908–09 (Tex.App.-Austin 2000, pet. denied), the Texas-based plaintiff TeleVentures contacted and visited International Game Technology in Nevada, and ultimately the parties signed agreements for International Game to develop some gaming systems for TeleVentures. However, the contracts did not state where either party would perform its obligations. Communication between the parties occurred between Texas and other states, but no representatives of International Game ever came to Texas. This Court held that such actions by International Game did not amount to sufficiently purposeful conduct. *Id.* at 910. By contrast, here the Holks had offered to perform the contract in Texas by picking up USA's representatives anywhere along the Gulf Coast and had repeatedly called a Texas business to ask it to renew its rental agreement.

In *3–D Electric,* a third entity—whose corporate identity the court refused to merge with the defendant's for purposes of jurisdiction—had initially solicited the contract with 3–D Electric, and the defendant had thereafter served as the general contractor and entered into the contract via phone negotiations with the plaintiff in Texas. *See 3–D Elec. Co., Inc. v. Barnett Const. Co.,* 706 S.W.2d 135, 142 (Tex.App.-Dallas 1986, writ ref'd n.r.e.). All construction work was done in Trinidad, and all meetings were conducted outside of Texas. *Id.* The *3–D* court said that "In *Beechem,* there were clearly more contacts with Texas than in the instant case and thus the '[n]arrow factual distinctions ... sufficed to swing the due process pendulum.'" *Id.* at 143. Unlike the Holks, the defendant in *3–D Electric* did not *solicit* the contract; we find this distinction significant. Similarly, in *Blair Communications, Inc. v. SES Survey Equipment Ser-*

*vices, Inc.,* 80 S.W.3d 723, 730 (Tex.App.-Houston [1st Dist.] 2002, no pet.), the parties were put into contact with each other by a third party, after which the defendant followed up by sending a contract to the plaintiff; the contract was performed outside of Texas, and payment was mailed to Texas. The court held that the facts were similar to those in *3–D* and refused to find personal jurisdiction. *Id.* at 730. Unlike these cases, the Holks directly solicited USA's business over the telephone by calling its Austin offices three times in three years to renew the parties' agreement.

■■■ Even though simply contracting with a Texas resident, alone, is not enough, *see Burger King,* 471 U.S. at 478, 105 S.Ct. 2174 here there are more intentional acts: active solicitation of USA's renewal of business over the telephone, offering to pick up USA along the Texas coast, and receipt of payment by the Holks drawn upon a Texas bank account.[4] Prior negotiations, contemplated future consequences, *the terms of the contract,* and the parties' actual course of dealing must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum. *Burger King,* 471 U.S. at 479, 105 S.Ct. 2174. The oral contract between USA and the Holks allowed USA to demand performance in Texas. USA presented evidence that the Holks solicited its business over the telephone on three separate occasions and offered to perform the contract in Texas. We conclude that this is sufficient to demonstrate that the Holks purposefully consummated a transaction in Texas, and the Holks have not negated jurisdiction on this basis.

The facts easily satisfy the second *Schlobohm* prong because USA's breach-of-contract cause of action is related to the

---

4. Although not dispositive, the record also indicates that Andy Holk had been to USA's Austin office, and that the boat had picked up other parties at Texas ports.

Holks' act in soliciting USA's business. *See 3–D Elec.*, 706 S.W.2d at 141 (breach-of-contract action related to act of making oral contract by initiating phone call to Texas); *Beechem*, 686 S.W.2d at 361–62 (cause of action for breach of contract arose from or was related to contacts with Texas because contract was solicited in Texas) (citing *McGee*, 355 U.S. 220, 78 S.Ct. 199).

▆▆▆▆ Regarding the third *Schlobohm* prong, we conclude that subjecting the Holks to the jurisdiction of the Texas courts does not offend traditional notions of fair play and substantial justice. Having actively and successfully solicited USA's continued business in Texas, it is not unreasonable to require the Holks to defend a suit based on their contacts with Texas. Although the quantity of the Holks' contacts with Texas may be minimal, the qualities of those contacts are substantial. *See Siskind*, 642 S.W.2d at 437. Only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Guardian Royal*, 815 S.W.2d at 231 (citing *Burger King*, 471 U.S. at 477–78, 105 S.Ct. 2174).

> [W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. *Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional.* For example, the potential clash of the forum's law with the "fundamental substantive social policies" of another State may be accommodated through application of the forum's choice-of-law rules. Similarly, a defendant claiming substan-

tial inconvenience may seek a change of venue.

*Burger King*, 471 U.S. at 477, 105 S.Ct. 2174 (emphasis added and footnotes omitted). The Holks have not made a compelling case to render jurisdiction over them unreasonable or unfair, and we hold that the trial court properly denied their special appearance. We overrule the Holks' sole issue.

## CONCLUSION

The Holks' solicitation of USA's business over the telephone on three occasions, in addition to their offer to perform the contract in Texas, was sufficiently purposeful to subject them to the jurisdiction of the Texas courts, and jurisdiction over them does not offend traditional notions of fair play and justice. Accordingly, we affirm the trial court's denial of the Holks' special appearance.

Dissenting opinion by Justice PATTERSON.

JAN P. PATTERSON, Justice, dissenting.

Because I adhere to the original, unanimous opinion and judgment issued on February 12, 2004, I respectfully dissent.

Ignoring the nature of the prior relationship between the parties, the majority concludes that it is irrelevant: "The prior arrangement between the parties, ending in 1998, bears little, if any, significance to the determination of whether soliciting USA's renewal business over the telephone was purposefully directed at Texas." In a contract suit based on an oral agreement, as this is, there is no authority for ignoring the *arrangement* between the parties, particularly where, as here, the petition alleges that "the agreement" was renewed each year. Further, in determining that one contract ended and another began, the ma-

jority improperly addresses the merits of this dispute.

The sole basis of USA's argument that the court has jurisdiction is that "Defendants have contracted in the state to do business with parties located within this state." Although the majority suggests that the initiation of the parties' relationship is "unclear," the only evidence in the record was provided by USA. USA's president, George Bogle, testified that he entered into a "deal" in 1994 with the Holks to finance building of the boat and "put [Andy] in business," and that the "original arrangement was probably made in Pensacola." USA does not dispute that the relationship began with an oral agreement made in 1994 in Florida; the sole jurisdictional allegation is that the Holks contracted "in this state with parties located within this state."

Nor does USA allege that the "arrangement" ended as the majority recites. That the prior arrangement is relevant is clear from the original petition which describes the nature of the "Agreement": the parties "*renewed* the Agreement each year since 1997 except for 2000 in which year Defendants' services were not used." (Emphasis added.) Bogle testified that in 2002, the year in which the alleged breach occurred, "Andy called and said he wanted to know if we wanted to use the boat." There is no allegation that Holk either made a misrepresentation or engaged in fraud. Rather, the sole allegation is that the Holks did not perform under the agreement to provide fishing trips and use of the boat.

The majority recites that Andy Holk called USA on the telephone "three times over four years to solicit its rental of the boat and offered to pick USA up in the boat anywhere along the Gulf Coast." The record shows the following: Andy Holk called USA once in 1999, once in 2001, and once in 2002 offering use of the boat, and USA agreed to its use; USA did not use the boat in 2000. The arrangements seemed to vary. In 2001, USA paid Holk periodically as it used the boat because "two years ago he had not shown up." Bogle testified that "[t]hey offered to pick you up anywhere on the gulf coast"; [1] the actual boat trips originated one time in Louisiana and "a couple or three times in Florida." [2] In 2002, USA prepaid the entire amount of $25,000, but used the boat only once for three days, then sued to recover the balance of the money paid for which it did not receive services.

If the original agreement is irrelevant, as asserted by the majority, then the question we are called to answer is whether the

---

**1.** The majority goes so far as to interpret the oral contract between the parties as allowing USA to "demand performance in Texas." This does not appear in the record. Bogle testified both that "[t]hey offered to pick you up anywhere on the gulf coast" and "they offered to pick me up anywhere on the Texas coast at any time," but that the Holks never did so. That the contract *could* have been performed in Texas is not determinative; specific jurisdiction turns on actual contacts and conduct directed to the forum state. Further, because the record does not demonstrate when the Holks made the "offer," we do not have sufficient facts to infer that this offer pertained to the arrangement to use the boat in 2002, the original agreement, or whether it was a term at any time.

**2.** There are no jurisdictional facts alleged in the petition or contained in testimony regarding Arthur Holk. In addition, Bogle's testimony that "I think they have picked people up ... at places along the Texas coast" might be relevant to an assessment of general jurisdiction, but is not relevant to USA's assertion of specific jurisdiction. *See BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 797 (Tex. 2002) (assertion of general jurisdiction requires proof of "substantial activities" within the forum). USA does not contend that general jurisdiction exists.

single call in 2002—or three calls over the four-year period if the entire arrangement is considered—constitutes the "purposeful availment" by a nonresident of the privilege of conducting activities within the forum state required to invoke the benefits and protections of the state's laws. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citing *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). This is to avoid jurisdiction based solely on "random," "fortuitous," or "attenuated" contacts that would not satisfy the due process requirements of "doing business" in Texas. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 17.041–.044 (West 1997), § 17.045 (West Supp.2004); *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991) (citing *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174). The exercise of personal jurisdiction is proper when the contacts "proximately result from actions" of the nonresident defendant, which create a "substantial connection" with the forum state. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. And the "substantial connection" between the nonresident defendant and the forum state necessary for a finding of minimum contacts must come about by action or conduct of the nonresident defendant "purposefully directed toward the forum state." *Id.*

Due process requires that a defendant not be haled into a Texas court unless his activities should have led him to reasonably anticipate being answerable here. *See Schlobohm v. Schapiro,* 784 S.W.2d 355, 359 (Tex.1990) (noting that "the quality, nature, and extent of [the nonresident's] activity in Texas justifies a conclusion that he should expect to be called to our courts"). Here, the single call from Alabama in 2002, or the three calls if we consider the whole arrangement, all of which led to use of the boat outside of Texas, cannot without more convert to the expectation of being haled into a Texas court.

These facts are distinguishable from those in *Rynone Manufacturing Corp. v. Republic Industries, Inc.,* 96 S.W.3d 636 (Tex.App.-Texarkana 2002, no pet.). But even in *Rynone,* the court considered the course of business between the parties, finding that "[t]he only evidence in the record about the origin of the parties' relationship" was a telephone solicitation on behalf of the nonresident Rynone directed toward the plaintiff Republic in the forum state. *Id.* at 639. In addition, Republic was aware of Rynone through advertisements placed in national trade publications, and the parties negotiated with each other by "several" telephone and facsimile communications. *Id.* Republic also produced drawings in the forum state that were forwarded to Rynone, where they became a part of the written contract. *Id.* The court thus considered prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, to evaluate whether Rynone purposefully established minimum contacts within the forum. *Id.*

Unlike this case, the very origin of the parties' relationship in *Rynone* was initiated by a telephone solicitation of business. Thus, the court found that the lawsuit "traces back" to this originating telephone call in which Rynone sought to do business with Republic. *Id.* at 640. Rynone initiated the business relationship between the parties through advertising and the telephone call. But jurisdiction did not rest on the telephone call alone. *Id.* And, although the majority acknowledges that *Rynone* is distinguishable because the parties' relationship *"began* via a telephone solicitation," they find it insignificant because they determine that the agreement

here ended and started anew with a telephone call.

But it is significant that the relationship here originated outside of Texas, at a time when USA may have been located in Arizona, and was not prompted by any purposeful solicitation of business in Texas. It is because of this relationship that the entire arrangement of the parties must be considered here. The majority's conclusion that the parties' prior arrangement ceased in 1998 and was later renewed by a telephone solicitation from the Holks is at odds with USA's allegation in its petition that the parties "have renewed the Agreement each year since 1997 except for 2000 in which year Defendants' services were not used" and that "Plaintiff has used the Boat each year for parties and outings."

As in *Rynone*, and unlike here, the relationship between the parties in *Beechem v. Pippin*, 686 S.W.2d 356 (Tex.App.-Austin 1985, no writ), originated with a telephone solicitation. But this Court did not find the origination call alone sufficient to confer jurisdiction. Rather, it was because the written contract was solicited, negotiated, and partially performed in Texas that the Court found that the out-of-state party had purposefully availed itself of the privilege of conducting activities within the forum state. "Pippin solicited the contract by a telephone call to Beechem in Texas, Beechem signed the contract here, and payments were made by mail to Beechem's business address in Texas." *Id.* at 361. Distinguishing other cases, this Court found that the nonresident had other contacts with Texas, including correspondence, payment for the moving of a sludge applicator in Texas, and causing its insurance agent to contact the Texas company to arrange coverage for the machine. *Id.* at 362. In *Beechem*, we concluded: "We do not imply by this opinion that merely contracting with a resident of this State

will alone support jurisdiction in Texas courts to determine whether a breach has occurred." *Id.* at 363. We went on to hold that the contacts of the nonresident— "those that were related to the cause as well as those that were unrelated—were quantitatively and qualitatively sufficient to make [the nonresident] answerable in the courts of Texas on the alleged breach of contract." *Id.*

And that is the question here: whether the contacts of the nonresident were quantitatively and qualitatively sufficient and purposefully directed to this forum. I would hold that the single call was insufficient: it did not form the basis for the relationship and there is no allegation that it was fraudulent or contained misrepresentations. Even the three telephone calls over a four-year period do not rise to the level of purposeful acts directed at the forum state sufficient to invoke the protections and benefits of Texas courts. But even if the single call in 2002 "renewed" a contractual relationship between the parties, there is no authority for resting jurisdiction in a contract case on a single call. The issue remains the same: to establish the minimum contacts with the forum state required to confer jurisdiction, only a nonresident that has purposefully availed itself of the privileges and benefits of conducting business in the forum state has sufficient contacts to confer personal jurisdiction.

Courts have specifically rejected jurisdiction based on a single telephone call to initiate a contract. In *Blair Communications, Inc. v. SES Survey Equipment Services, Inc.*, our sister court in Houston concluded: "We do not believe that initiating contract discussions with a Texas resident, and subsequently entering into a contract, in addition to making payment in Texas, are sufficient contacts with Texas when the entire substance of the contract is performed outside the state." 80

S.W.3d 723, 730 (Tex.App.-Houston [1st Dist.] 2002, no pet.). *See also Electrosource, Inc. v. Horizon Battery Techs.,* 176 F.3d 867, 872 (5th Cir.1999) (applying Texas law) (contract with an out-of-state party alone does not automatically establish sufficient minimum contacts; other factors must be considered); *J.D. Fields & Co. v. W.H. Streit, Inc.,* 21 S.W.3d 599, 604 (Tex. App.-Houston [1st Dist.] 2000, no pet.) (same); *TeleVentures, Inc. v. International Game Tech.,* 12 S.W.3d 900, 909 (Tex. App.-Austin 2000, pet. denied) (same). The court in *Blair Communications* further rejected a bright-line test that focuses solely on the initiation of contact between the parties: "While purposeful contact with the forum state is an important component of the minimum contacts analysis, equally important is the requirement that there be a substantial connection between the nonresident defendant and the forum state arising from such contact." *Id.* (quoting *Ring Power Sys. v. International de Comercio Y Consultoria, S.A.,* 39 S.W.3d 350, 354 (Tex.App.-Houston [14th Dist.] 2001, no pet.)).

There is no showing that the Holks engaged in purposeful activities within the forum state or had the necessary minimum contacts to subject them to personal jurisdiction in Texas. The Holks' only affirmative acts directed toward Texas were three calls to USA in Austin over four years to arrange for use of the boat. Otherwise, the evidence shows that the relationship originated outside of Texas, USA never used the boat on the Texas coast, and the Holks are residents of Alabama who maintain their business in Alabama. The Holks' activities do not justify an expectation of being haled into a Texas court.

Because the Holks' contacts with Texas were insufficient to avail themselves of the privileges, benefits, and protections of this state, *see Beechem,* 686 S.W.2d at 361,

haling them into a Texas court would "offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Schlobohm,* 784 S.W.2d at 358. Accordingly, I would reverse the judgment of the trial court, render judgment granting the Holks' special appearance, and order dismissal of USA's suit for lack of personal jurisdiction.