# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00246-CV

**Navasota Resources, Ltd., Appellant**

**v.**

**Heep Petroleum, Inc. and Larry W. Kimes, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
## NO. 97-01738, HONORABLE PETER M. LOWRY, JUDGE PRESIDING

## O P I N I O N

In this accelerated, interlocutory appeal, appellant Navasota Resources, Ltd., challenges the trial court's denial of its special appearance. Appellee Heep Petroleum, Inc.[1] sued Navasota and several other defendants for breach of contract, breach of fiduciary duties, fraud, conversion, and tortious interference with a contract arising out of oil and gas leases primarily located in Montana and North Dakota. Because sufficient evidence supports the trial court's exercise of jurisdiction, we affirm the trial court's denial of Navasota's special appearance.

---

[1]  In their first amended petition, Heep Petroleum and appellee Larry W. Kimes describe Kimes's interest in the suit as follows: "Kimes is vice president of Heep Petroleum. By written assignment, . . . Heep Petroleum assigned a portion of its interest in the Compensation Agreement . . . to Kimes." We will refer to appellees collectively as "Heep Petroleum," and to Boone H. Heep, III, Heep Petroleum's president and chief executive officer, as "Heep."

## Factual Background

Navasota is a Canadian company that is involved in the drilling of oil and gas wells. Heep Petroleum is a Texas corporation that focuses on generating oil and gas projects and also acts as an independent producer. Although Navasota has worked with other Texas companies on projects located in Texas and other states, those contacts are not relevant to our discussion in this case. We will only consider Navasota's contacts with Heep Petroleum with regard to the Williston Program, which is the subject of this suit and involved oil and gas leases in Montana and North Dakota.

Boone Heep, III, Heep Petroleum's president and chief executive officer, first heard of Navasota in 1993 when he met Jim Simpson, who Heep understood to be "affiliated" with Navasota, at a barbeque in Texas. In the fall of 1995, Simpson returned to Texas, where he was again introduced to Heep. Simpson told Heep that he was looking for oil and gas projects on Navasota's behalf and expressed an interest in the Williston Program.[2] Shortly thereafter, Simpson came back to Texas to meet with Heep and learn more about the project.

On October 19, 1995, Simpson met with Heep and the owner of another Texas corporation that was a partner in the Williston Program. At the conclusion of the presentation, Simpson called Navasota's president, Bill Sanesh, and explained the deal. Simpson hung up and told Heep, "We'll take the deal." The parties—Navasota, Heep Petroleum, and two other Texas

---

[2] The parties introduced several press releases issued by Navasota that list Simpson as a Navasota officer or employee along with Navasota's president and other executives. Simpson was titled, "Corporate Development," and was described as having the responsibility to "promote [Navasota] in the United States and to find and develop corporate opportunities." The issuance dates of the press releases are uncertain, but they possibly show Simpson acting in that capacity perhaps as early as mid-1995 and into 1996.

companies—then drafted and executed a letter of intent based on the meeting's negotiations; Sanesh signed on Navasota's behalf, and Heep signed for Heep Petroleum. In December 1995, the same parties executed a Participation and Exploration Agreement setting forth the terms of the joint venture; Sanesh again signed on behalf of Navasota. The agreements provided that the laws of Texas would govern the validity, construction, and interpretation of the agreement and required that any disputes be submitted to binding arbitration under the Texas General Arbitration Act.

In 1997, Heep Petroleum and others sued two Texas citizens who had worked with Heep Petroleum in marketing various oil and gas projects, including the Williston joint venture. In 1999, Heep Petroleum amended its petition to join Navasota as a defendant. Navasota filed a special appearance, asserting that it was not subject to personal jurisdiction in Texas. After a hearing, the trial court overruled the special appearance. Navasota appeals, arguing that it lacks sufficient minimum contacts with Texas to justify the trial court's exercise of personal jurisdiction. Navasota contends that because the various agreements concerned oil and gas leases in Montana and North Dakota, the trial court improperly exercised jurisdiction; it further disputes whether Simpson had the authority to act on Navasota's behalf in negotiating the terms of the Williston Program.

### Standard of Review

A plaintiff suing a nonresident defendant bears the initial burden of pleading sufficient allegations to satisfy the Texas long-arm statute, which authorizes a trial court to exercise jurisdiction over a nonresident who "does business" in Texas. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793, 795 (Tex. 2002); *see* Tex. Civ. Prac. & Rem. Code Ann. § 17.042

3

(West 1997) (Texas's long-arm statute). Texas courts may exercise personal jurisdiction over a nonresident if it is authorized by the Texas long-arm statute and comports with constitutional guarantees of due process. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990). The Texas long-arm statute reaches as far as the federal Constitution permits and, therefore, our state-law due process analysis is consistent with the federal test. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991). Once the plaintiff pleads sufficient facts to satisfy the long-arm statute, the burden shifts to the defendant to negate all asserted jurisdictional bases. *See BMC Software*, 83 S.W.3d at 793.

Personal jurisdiction may arise through either specific jurisdiction, under which the cause of action is tied to the defendant's act in Texas, or general jurisdiction, which arises from continuing and systematic contacts in Texas. *Schlobohm*, 784 S.W.2d at 358; *General Elec. Co. v. Brown & Ross Int'l Distribs., Inc.*, 804 S.W.2d 527, 531 (Tex. App.—Houston [1st Dist.] 1990, writ denied). A nonresident defendant may be subject to specific jurisdiction in Texas if (1) it purposefully does some act or consummates some transaction in Texas, thus establishing minimum contacts with the forum; (2) that act or transaction is connected or gives rise to the cause of action; and (3) the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Schlobohm*, 784 S.W.2d at 358. The "touchstone" of our jurisdictional analysis is whether the nonresident purposefully availed itself of the benefits of conducting business in Texas. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). We consider the defendant's contacts and ask whether they were purposeful, not "random, isolated, or fortuitous," and whether the defendant availed itself of the forum. *Id*. at 785 (quoting *Keeton v. Hustler Magazine, Inc.*, 465

4

U.S. 770, 774 (1984)). Because specific jurisdiction requires a substantial connection between Texas, the lawsuit, and the *defendant*, not the *plaintiff*, we focus not on where the injury was felt, but on the defendant's actions in Texas. *Id*. at 789-90.

Whether a trial court properly granted or denied a special appearance is a question of law that we review de novo. *BMC Software*, 83 S.W.3d at 794. In making a jurisdictional determination, the trial court must resolve necessary factual questions. *Id*. The trial court is the sole judge of witness credibility and the weight to be given to testimony. *Young Chevrolet, Inc. v. Texas Motor Vehicle Bd.*, 974 S.W.3d 906, 914 (Tex. App.—Austin 1998, pet. denied). We may not disturb a trial court's resolution of evidentiary conflicts that turn on credibility determinations or the weight of the evidence. *Benoit v. Wilson*, 239 S.W.2d 792, 796-97 (Tex. 1951); *Young Chevrolet*, 974 S.W.2d at 914. In determining whether the evidence is sufficient to support a trial court's factual determinations, we consider the entire record and conduct an ordinary sufficiency review, setting aside the trial court's finding only if it is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951). If a trial court does not issue findings of fact and conclusions of law when ruling on a special appearance, we will assume that the court made all necessary findings of fact that are supported by the evidence. *BMC Software*, 83 S.W.3d at 795. If the record includes the reporter's and clerk's records, those implied findings may be challenged for legal and factual sufficiency. *Id*. We will affirm the trial court's determination on any legal theory supported by the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

5

## Specific Jurisdiction

Although Navasota disputed whether Jim Simpson had the authority to act on its behalf in the fall of 1995, when the contract was negotiated in Texas, the trial court impliedly found that Simpson had such authority. There was evidence to support this implied finding in the form of testimony by Boone Heep and press releases issued by Navasota listing Simpson as head of corporate development. Simpson traveled to Texas and told Heep that he was seeking business opportunities for Navasota. After Simpson and Heep negotiated the terms of the deal during their October 1995 meeting, Navasota entered into the resulting letter of intent and related amendments and agreements.[3] The trial court as fact-finder had sufficient evidence on which to base its implied finding that

---

[3] Navasota disputed whether Simpson was authorized to represent it in the fall of 1995, and in its response to interrogatories, it stated that Simpson was not an officer, director, or representative of Navasota when he met with Heep in the fall of 1995. However, at the hearing on Navasota's special appearance, Heep testified that Simpson told him he was seeking opportunities for Navasota and that he heard Simpson call Sanesh following the October 1995 meeting, at the end of which Simpson told Heep, "We'll take the deal." Heep was also asked about three Navasota press releases that were introduced into evidence. One is dated "9/96" and lists Simpson as part of Navasota's management team in charge of "Corporate Development." The other two are not dated; one lists Simpson as head of corporate development and refers to projects that "will commence in the summer of 1996 and have a positive affect [sic] on the cash flow during the fall of 2006," leading to the conclusion that the release was issued sometime before the summer of 1996. The other undated press release gives short biographies about its president, director, chairman, secretary/treasurer, and Simpson, who is titled "Corporate Development" and described as having the role to "promote [Navasota] in the United States and to find and develop corporate opportunities." This release announces that effective June 2, 1995, the company had changed its name to Navasota and that in 1995 new directors had been elected. Heep agreed that according to this release, "[a]s early as June 2, 1995, Mr. Simpson was in charge of corporate development for Navasota." The press releases had already been introduced into evidence when Navasota objected, arguing that their issuance dates had not been established. The trial court overruled the objection, and Navasota did not question Heep as to his knowledge of the issuance dates. We will not second-guess the trial court's resolution of evidentiary conflicts or credibility determinations. *Benoit v. Wilson*, 239 S.W.2d 792, 796-97 (Tex. 1951); *Young Chevrolet, Inc. v. Texas Motor Vehicle Bd.*, 974 S.W.3d 906, 914 (Tex. App.—Austin 1998, pet. denied).

Simpson was authorized to act for Navasota during the fall of 1995, when the contract was negotiated, and we may not disturb the court's resolution of evidentiary conflicts or issues of credibility. *See Benoit*, 239 S.W.2d at 796-97; *Young Chevrolet*, 974 S.W.3d at 914.

There was sufficient evidence to support the following implied findings of fact: Simpson, acting as Navasota's head of corporate development, traveled to Texas, where he told Heep he was looking into oil and gas projects on Navasota's behalf. Simpson expressed an interest in the Williston Program, and on October 19, he returned to Texas and met with Heep and the president of another Texas-based company, who provided a presentation about the project. At the end of the meeting, Simpson called Navasota's president and then told Heep, "We'll take the deal." The parties drafted a letter of intent summarizing the terms negotiated during the meeting, and the parties executed the letter of intent on November 1; Navasota's president signed on Navasota's behalf. From December into early 1996, Navasota and Heep Petroleum negotiated and signed amendments to their letter of intent and other contracts related to this and one other project in South Dakota.

Although the Williston Program sites were not located in Texas, Navasota purposefully availed itself of the benefits of doing business in Texas. First, Navasota sent an authorized representative to Texas to solicit and negotiate business deals. *See Holk v. USA Managed Care Org., Inc.*, 149 S.W.3d 769, 776 (Tex. App.—Austin 2004, no pet.) (op. on reh'g) (defendants actively solicited contracts with Texas plaintiff); *General Elec. Co.*, 804 S.W.2d at 532-33 (defendant traveled to and telephoned companies in Texas to solicit business). Then, once Simpson made contact with Heep, he returned to Texas and negotiated a contract on Navasota's behalf with Heep Petroleum, a Texas company. *See Fish v. Tandy Corp.*, 948 S.W.2d 886, 895 (Tex.

7

App.—Fort Worth 1997, pet. denied) (defendant negotiated contracts with Texas company through personal visits and telephone calls). Finally, after Simpson's negotiations, Navasota entered into the contract, conducted further negotiations to amend the letter of intent, and made numerous contacts with Heep Petroleum in Texas. *See Holk*, 149 S.W.3d at 776 (after soliciting business in Texas, defendants entered into contract with Texas company that included possibility of partial performance in Texas); *Fish*, 948 S.W.2d at 895 (defendant executed letter agreement and paid Texas company from his personal account). The claims at issue in this case arise directly out of Navasota's purposeful contacts with Texas, thus satisfying the requirements for specific jurisdiction. *See BMC Software*, 83 S.W.3d at 795-96. Therefore, based on the quality and nature of Navasota's contacts in Texas with Heep and Heep Petroleum, sufficient evidence supported the trial court's finding that Navasota was subject to specific jurisdiction in Texas.[4] *See Holk*, 149 S.W.3d at 776; *Fish*, 948 S.W.2d at 895.

## Fair Play and Substantial Justice

Having held that Heep Petroleum established that Navasota had sufficient contact with Texas to justify the exercise of specific jurisdiction, we must ensure that the exercise of jurisdiction will comport with traditional notions of fair play and substantial justice. *Guardian Royal*, 815 S.W.2d at 226; *Holk*, 149 S.W.3d at 777. In making this determination, we consider the relative convenience of the parties, Texas's interest in adjudicating the dispute, the interstate judicial

---

[4] Once specific jurisdiction is established, we need not consider whether general jurisdiction may be exercised. *See Daimler-Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 725 (Tex. App.—Austin 2000, pet. dism'd w.o.j.); *see also* Tex. R. App. P. 47.1 (court of appeals must hand down opinion that is "as brief as practicable").

system's interest in the efficient resolution of disputes, and the various states's interest in furthering fundamental substantive social policies. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Although the minimum-contacts analysis considers issues of fairness, making it less likely that the exercise of jurisdiction will violate notions of fair play, this analysis is separate and distinct from the minimum-contact issue and must be conducted. *Schlobohm*, 784 S.W.2d at 357-58. If the court finds the minimum contacts necessary to exercise jurisdiction, only rarely will the exercise of jurisdiction not comport with fair play and substantial justice, and the defendant must present a compelling argument that the exercise of jurisdiction would be unreasonable. *Guardian Royal*, 815 S.W.2d at 231 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

Navasota argues that the burden of litigating this cause in Texas would be great because it is a Canadian company located in a remote region of British Columbia and travel expenses are prohibitive. The projects at issue in the lawsuit are in Montana and North Dakota, and Navasota contends that therefore Texas's interest in hearing the dispute is minimal, saying, "The only connection to Texas is the fact that Heep is a Texas resident." We disagree.

Simpson traveled to Texas multiple times to solicit business for Navasota, Navasota held leasehold interests in other projects in several Texas counties, and Navasota did not offer evidence at the hearing or identify its representatives or witnesses. Thus, we cannot say that litigating the dispute here would be unreasonably burdensome. Further, Texas has a legitimate interest in adjudicating this dispute because the parties negotiated the agreements here and chose Texas law to govern their agreements. *See Fish*, 948 S.W.2d at 896 ("[A]t least one agreement at issue in this lawsuit compels arbitration in Texas. Accordingly, Texas has a significant interest in

adjudicating the dispute."). Finally, allowing these issues to be resolved in one lawsuit here in Texas, rather than possibly through separate suits in North Dakota and Montana, will further the judicial system's interest in efficient dispute resolution. *See id.* We hold that the exercise of jurisdiction over Navasota will not offend traditional notions of fair play and substantial justice.[5]

## Conclusion

We have held that Navasota had sufficient contacts with Texas to justify the exercise of specific personal jurisdiction and that the exercise of such jurisdiction will not offend the traditional notions of fair play and substantial justice. Therefore, we affirm the trial court's order overruling Navasota's special appearance.

_____

David Puryear, Justice

Before Justice B. A. Smith, Patterson and Puryear:  Opinion by Justice Puryear;
    Concurring Opinion by Justice Patterson

Affirmed

Filed:   June 30, 2006

---

[5] Our jurisdictional inquiry merely asks whether Navasota sufficiently engaged in purposeful, minimum contacts toward Texas in connection with the underlying dispute. Any other issues are reserved for trial on the merits. *See Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 554 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (in deciding jurisdictional inquiry, "trial court should rely only upon the necessary jurisdictional facts and should not reach the merits of the case").