TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-05-00246-CV






Navasota Resources, Ltd., Appellant


v.


Heep Petroleum, Inc. and Larry W. Kimes, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT

NO. 97-01738, HONORABLE PETER M. LOWRY, JUDGE PRESIDING





O P I N I O N




 In this accelerated, interlocutory appeal, appellant Navasota Resources, Ltd.,
challenges the trial court's denial of its special appearance. Appellee Heep Petroleum, Inc. (1) sued
Navasota and several other defendants for breach of contract, breach of fiduciary duties, fraud,
conversion, and tortious interference with a contract arising out of oil and gas leases primarily
located in Montana and North Dakota. Because sufficient evidence supports the trial court's exercise
of jurisdiction, we affirm the trial court's denial of Navasota's special appearance.

Factual Background


 Navasota is a Canadian company that is involved in the drilling of oil and gas wells. 
Heep Petroleum is a Texas corporation that focuses on generating oil and gas projects and also acts
as an independent producer. Although Navasota has worked with other Texas companies on projects
located in Texas and other states, those contacts are not relevant to our discussion in this case. We
will only consider Navasota's contacts with Heep Petroleum with regard to the Williston Program,
which is the subject of this suit and involved oil and gas leases in Montana and North Dakota.

 Boone Heep, III, Heep Petroleum's president and chief executive officer, first heard
of Navasota in 1993 when he met Jim Simpson, who Heep understood to be "affiliated" with
Navasota, at a barbeque in Texas. In the fall of 1995, Simpson returned to Texas, where he was
again introduced to Heep. Simpson told Heep that he was looking for oil and gas projects on
Navasota's behalf and expressed an interest in the Williston Program. (2) Shortly thereafter, Simpson
came back to Texas to meet with Heep and learn more about the project.

 On October 19, 1995, Simpson met with Heep and the owner of another Texas
corporation that was a partner in the Williston Program. At the conclusion of the presentation,
Simpson called Navasota's president, Bill Sanesh, and explained the deal. Simpson hung up and told
Heep, "We'll take the deal." The parties--Navasota, Heep Petroleum, and two other Texas
companies--then drafted and executed a letter of intent based on the meeting's negotiations; Sanesh
signed on Navasota's behalf, and Heep signed for Heep Petroleum. In December 1995, the same
parties executed a Participation and Exploration Agreement setting forth the terms of the joint
venture; Sanesh again signed on behalf of Navasota. The agreements provided that the laws of
Texas would govern the validity, construction, and interpretation of the agreement and required that
any disputes be submitted to binding arbitration under the Texas General Arbitration Act.

 In 1997, Heep Petroleum and others sued two Texas citizens who had worked with
Heep Petroleum in marketing various oil and gas projects, including the Williston joint venture. In
1999, Heep Petroleum amended its petition to join Navasota as a defendant. Navasota filed a special
appearance, asserting that it was not subject to personal jurisdiction in Texas. After a hearing, the
trial court overruled the special appearance. Navasota appeals, arguing that it lacks sufficient
minimum contacts with Texas to justify the trial court's exercise of personal jurisdiction. Navasota
contends that because the various agreements concerned oil and gas leases in Montana and North
Dakota, the trial court improperly exercised jurisdiction; it further disputes whether Simpson had the
authority to act on Navasota's behalf in negotiating the terms of the Williston Program.


Standard of Review


 A plaintiff suing a nonresident defendant bears the initial burden of pleading
sufficient allegations to satisfy the Texas long-arm statute, which authorizes a trial court to exercise
jurisdiction over a nonresident who "does business" in Texas. BMC Software Belgium, N.V. v.
Marchand, 83 S.W.3d 789, 793, 795 (Tex. 2002); see Tex. Civ. Prac. & Rem. Code Ann. § 17.042
(West 1997) (Texas's long-arm statute). Texas courts may exercise personal jurisdiction over a
nonresident if it is authorized by the Texas long-arm statute and comports with constitutional
guarantees of due process. Schlobohm v. Schapiro, 784 S.W.2d 355, 356 (Tex. 1990). The Texas
long-arm statute reaches as far as the federal Constitution permits and, therefore, our state-law due
process analysis is consistent with the federal test. Guardian Royal Exch. Assurance, Ltd. v. English
China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991). Once the plaintiff pleads sufficient facts
to satisfy the long-arm statute, the burden shifts to the defendant to negate all asserted jurisdictional
bases. See BMC Software, 83 S.W.3d at 793.

 Personal jurisdiction may arise through either specific jurisdiction, under which the
cause of action is tied to the defendant's act in Texas, or general jurisdiction, which arises from
continuing and systematic contacts in Texas. Schlobohm, 784 S.W.2d at 358; General Elec. Co. v.
Brown & Ross Int'l Distribs., Inc., 804 S.W.2d 527, 531 (Tex. App.--Houston [1st Dist.] 1990, writ
denied). A nonresident defendant may be subject to specific jurisdiction in Texas if (1) it
purposefully does some act or consummates some transaction in Texas, thus establishing minimum
contacts with the forum; (2) that act or transaction is connected or gives rise to the cause of action;
and (3) the exercise of jurisdiction does not offend traditional notions of fair play and substantial
justice. Schlobohm, 784 S.W.2d at 358. The "touchstone" of our jurisdictional analysis is whether
the nonresident purposefully availed itself of the benefits of conducting business in Texas. Michiana
Easy Livin' Country, Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005). We consider the defendant's
contacts and ask whether they were purposeful, not "random, isolated, or fortuitous," and whether
the defendant availed itself of the forum. Id. at 785 (quoting Keeton v. Hustler Magazine, Inc., 465
U.S. 770, 774 (1984)). Because specific jurisdiction requires a substantial connection between
Texas, the lawsuit, and the defendant, not the plaintiff, we focus not on where the injury was felt,
but on the defendant's actions in Texas. Id. at 789-90.

 Whether a trial court properly granted or denied a special appearance is a question
of law that we review de novo. BMC Software, 83 S.W.3d at 794. In making a jurisdictional
determination, the trial court must resolve necessary factual questions. Id. The trial court is the sole
judge of witness credibility and the weight to be given to testimony. Young Chevrolet, Inc. v. Texas
Motor Vehicle Bd., 974 S.W.3d 906, 914 (Tex. App.--Austin 1998, pet. denied). We may not
disturb a trial court's resolution of evidentiary conflicts that turn on credibility determinations or the
weight of the evidence. Benoit v. Wilson, 239 S.W.2d 792, 796-97 (Tex. 1951); Young Chevrolet,
974 S.W.2d at 914. In determining whether the evidence is sufficient to support a trial court's
factual determinations, we consider the entire record and conduct an ordinary sufficiency review,
setting aside the trial court's finding only if it is so against the great weight and preponderance of
the evidence as to be manifestly erroneous or unjust. In re King's Estate, 244 S.W.2d 660, 661 (Tex.
1951). If a trial court does not issue findings of fact and conclusions of law when ruling on a special
appearance, we will assume that the court made all necessary findings of fact that are supported by
the evidence. BMC Software, 83 S.W.3d at 795. If the record includes the reporter's and clerk's
records, those implied findings may be challenged for legal and factual sufficiency. Id. We will
affirm the trial court's determination on any legal theory supported by the evidence. Worford v.
Stamper, 801 S.W.2d 108, 109 (Tex. 1990). 


Specific Jurisdiction


 Although Navasota disputed whether Jim Simpson had the authority to act on its
behalf in the fall of 1995, when the contract was negotiated in Texas, the trial court impliedly found
that Simpson had such authority. There was evidence to support this implied finding in the form of
testimony by Boone Heep and press releases issued by Navasota listing Simpson as head of corporate
development. Simpson traveled to Texas and told Heep that he was seeking business opportunities
for Navasota. After Simpson and Heep negotiated the terms of the deal during their October 1995
meeting, Navasota entered into the resulting letter of intent and related amendments and agreements. (3) 
The trial court as fact-finder had sufficient evidence on which to base its implied finding that
Simpson was authorized to act for Navasota during the fall of 1995, when the contract was
negotiated, and we may not disturb the court's resolution of evidentiary conflicts or issues of
credibility. See Benoit, 239 S.W.2d at 796-97; Young Chevrolet, 974 S.W.3d at 914. 

 There was sufficient evidence to support the following implied findings of fact: 
Simpson, acting as Navasota's head of corporate development, traveled to Texas, where he told Heep
he was looking into oil and gas projects on Navasota's behalf. Simpson expressed an interest in the
Williston Program, and on October 19, he returned to Texas and met with Heep and the president
of another Texas-based company, who provided a presentation about the project. At the end of the
meeting, Simpson called Navasota's president and then told Heep, "We'll take the deal." The parties
drafted a letter of intent summarizing the terms negotiated during the meeting, and the parties
executed the letter of intent on November 1; Navasota's president signed on Navasota's behalf. 
From December into early 1996, Navasota and Heep Petroleum negotiated and signed amendments
to their letter of intent and other contracts related to this and one other project in South Dakota.

 Although the Williston Program sites were not located in Texas, Navasota
purposefully availed itself of the benefits of doing business in Texas. First, Navasota sent an
authorized representative to Texas to solicit and negotiate business deals. See Holk v. USA Managed
Care Org., Inc., 149 S.W.3d 769, 776 (Tex. App.--Austin 2004, no pet.) (op. on reh'g) (defendants
actively solicited contracts with Texas plaintiff); General Elec. Co., 804 S.W.2d at 532-33
(defendant traveled to and telephoned companies in Texas to solicit business). Then, once Simpson
made contact with Heep, he returned to Texas and negotiated a contract on Navasota's behalf with
Heep Petroleum, a Texas company. See Fish v. Tandy Corp., 948 S.W.2d 886, 895 (Tex.
App.--Fort Worth 1997, pet. denied) (defendant negotiated contracts with Texas company through
personal visits and telephone calls). Finally, after Simpson's negotiations, Navasota entered into the
contract, conducted further negotiations to amend the letter of intent, and made numerous contacts
with Heep Petroleum in Texas. See Holk, 149 S.W.3d at 776 (after soliciting business in Texas,
defendants entered into contract with Texas company that included possibility of partial performance
in Texas); Fish, 948 S.W.2d at 895 (defendant executed letter agreement and paid Texas company
from his personal account). The claims at issue in this case arise directly out of Navasota's
purposeful contacts with Texas, thus satisfying the requirements for specific jurisdiction. See BMC
Software, 83 S.W.3d at 795-96. Therefore, based on the quality and nature of Navasota's contacts
in Texas with Heep and Heep Petroleum, sufficient evidence supported the trial court's finding that
Navasota was subject to specific jurisdiction in Texas. (4) See Holk, 149 S.W.3d at 776; Fish, 948
S.W.2d at 895. 


Fair Play and Substantial Justice


 Having held that Heep Petroleum established that Navasota had sufficient contact
with Texas to justify the exercise of specific jurisdiction, we must ensure that the exercise of
jurisdiction will comport with traditional notions of fair play and substantial justice. Guardian
Royal, 815 S.W.2d at 226; Holk, 149 S.W.3d at 777. In making this determination, we consider the
relative convenience of the parties, Texas's interest in adjudicating the dispute, the interstate judicial
system's interest in the efficient resolution of disputes, and the various states's interest in furthering
fundamental substantive social policies. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286,
292 (1980). Although the minimum-contacts analysis considers issues of fairness, making it less
likely that the exercise of jurisdiction will violate notions of fair play, this analysis is separate and
distinct from the minimum-contact issue and must be conducted. Schlobohm, 784 S.W.2d at 357-58. 
If the court finds the minimum contacts necessary to exercise jurisdiction, only rarely will the
exercise of jurisdiction not comport with fair play and substantial justice, and the defendant must
present a compelling argument that the exercise of jurisdiction would be unreasonable. Guardian
Royal, 815 S.W.2d at 231 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)).

 Navasota argues that the burden of litigating this cause in Texas would be great
because it is a Canadian company located in a remote region of British Columbia and travel expenses
are prohibitive. The projects at issue in the lawsuit are in Montana and North Dakota, and Navasota
contends that therefore Texas's interest in hearing the dispute is minimal, saying, "The only
connection to Texas is the fact that Heep is a Texas resident." We disagree.

 Simpson traveled to Texas multiple times to solicit business for Navasota, Navasota
held leasehold interests in other projects in several Texas counties, and Navasota did not offer
evidence at the hearing or identify its representatives or witnesses. Thus, we cannot say that
litigating the dispute here would be unreasonably burdensome. Further, Texas has a legitimate
interest in adjudicating this dispute because the parties negotiated the agreements here and chose
Texas law to govern their agreements. See Fish, 948 S.W.2d at 896 ("[A]t least one agreement at
issue in this lawsuit compels arbitration in Texas. Accordingly, Texas has a significant interest in
adjudicating the dispute."). Finally, allowing these issues to be resolved in one lawsuit here in
Texas, rather than possibly through separate suits in North Dakota and Montana, will further the
judicial system's interest in efficient dispute resolution. See id. We hold that the exercise of
jurisdiction over Navasota will not offend traditional notions of fair play and substantial justice. (5)


Conclusion


 We have held that Navasota had sufficient contacts with Texas to justify the exercise
of specific personal jurisdiction and that the exercise of such jurisdiction will not offend the
traditional notions of fair play and substantial justice. Therefore, we affirm the trial court's order
overruling Navasota's special appearance.



 __________________________________________

 David Puryear, Justice

Before Justice B. A. Smith, Patterson and Puryear: Opinion by Justice Puryear;

 Concurring Opinion by Justice Patterson

Affirmed

Filed: June 30, 2006

1. In their first amended petition, Heep Petroleum and appellee Larry W. Kimes describe
Kimes's interest in the suit as follows: "Kimes is vice president of Heep Petroleum. By written
assignment, . . . Heep Petroleum assigned a portion of its interest in the Compensation Agreement
. . . to Kimes." We will refer to appellees collectively as "Heep Petroleum," and to Boone H. Heep,
III, Heep Petroleum's president and chief executive officer, as "Heep."
2. The parties introduced several press releases issued by Navasota that list Simpson as a
Navasota officer or employee along with Navasota's president and other executives. Simpson was
titled, "Corporate Development," and was described as having the responsibility to "promote
[Navasota] in the United States and to find and develop corporate opportunities." The issuance dates
of the press releases are uncertain, but they possibly show Simpson acting in that capacity perhaps
as early as mid-1995 and into 1996.
3. Navasota disputed whether Simpson was authorized to represent it in the fall of 1995, and
in its response to interrogatories, it stated that Simpson was not an officer, director, or representative
of Navasota when he met with Heep in the fall of 1995. However, at the hearing on Navasota's
special appearance, Heep testified that Simpson told him he was seeking opportunities for Navasota
and that he heard Simpson call Sanesh following the October 1995 meeting, at the end of which 
Simpson told Heep, "We'll take the deal." Heep was also asked about three Navasota press releases
that were introduced into evidence. One is dated "9/96" and lists Simpson as part of Navasota's
management team in charge of "Corporate Development." The other two are not dated; one lists
Simpson as head of corporate development and refers to projects that "will commence in the summer
of 1996 and have a positive affect [sic] on the cash flow during the fall of 2006," leading to the
conclusion that the release was issued sometime before the summer of 1996. The other undated
press release gives short biographies about its president, director, chairman, secretary/treasurer, and
Simpson, who is titled "Corporate Development" and described as having the role to "promote
[Navasota] in the United States and to find and develop corporate opportunities." This release
announces that effective June 2, 1995, the company had changed its name to Navasota and that in
1995 new directors had been elected. Heep agreed that according to this release, "[a]s early as June
2, 1995, Mr. Simpson was in charge of corporate development for Navasota." The press releases
had already been introduced into evidence when Navasota objected, arguing that their issuance dates
had not been established. The trial court overruled the objection, and Navasota did not question
Heep as to his knowledge of the issuance dates. We will not second-guess the trial court's resolution
of evidentiary conflicts or credibility determinations. Benoit v. Wilson, 239 S.W.2d 792, 796-97
(Tex. 1951); Young Chevrolet, Inc. v. Texas Motor Vehicle Bd., 974 S.W.3d 906, 914 (Tex.
App.--Austin 1998, pet. denied).
4. Once specific jurisdiction is established, we need not consider whether general jurisdiction
may be exercised. See Daimler-Benz Aktiengesellschaft v. Olson, 21 S.W.3d 707, 725 (Tex.
App.--Austin 2000, pet. dism'd w.o.j.); see also Tex. R. App. P. 47.1 (court of appeals must hand
down opinion that is "as brief as practicable").
5. Our jurisdictional inquiry merely asks whether Navasota sufficiently engaged in purposeful,
minimum contacts toward Texas in connection with the underlying dispute. Any other issues are
reserved for trial on the merits. See Walker Ins. Servs. v. Bottle Rock Power Corp., 108 S.W.3d 538,
554 (Tex. App.--Houston [14th Dist.] 2003, no pet.) (in deciding jurisdictional inquiry, "trial court
should rely only upon the necessary jurisdictional facts and should not reach the merits of the case").