Opinion issued June 9, 2016



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00952-CV

———————————

**ATOM NANOELECTRONICS, INC. AND KRIS SMOLINSKI, Appellants**

**V.**

**APPLIED NANOFLUORESCENCE, LLC, Appellee**

---

**On Appeal from County Civil Court at Law No. 2**
**Harris County, Texas**
**Trial Court Case No. 1059909**

---

## MEMORANDUM OPINION

Applied NanoFluorescence, LLC, filed suit against Atom Nanoelectronics, Inc. and Kris Smolinski in Harris County, Texas, asserting claims of breach of contract, unjust enrichment, and fraud in the inducement. Atom and Smolinski filed special appearances, arguing the court lacked personal jurisdiction over them. The

trial court denied both special appearances, and Atom and Smolinski appealed. In one issue, they argue the trial court erred by denying their special appearances.

We affirm.

## Background

Applied Nano is a company located in Houston, Texas. It was founded by its president, R. Bruce Weisman. Atom is a company located in California. Smolinski, Atom's CEO, also resides in California.

Applied Nano manufactures an instrument known as the "NS3 NanoSpectralyzer system." In December 2013, Atom contacted Applied Nano, expressing an interest in the instrument. Atom sent two samples to Applied Nano to analyze with the instrument. Applied Nano analyzed and returned the samples to Atom along with the test results.

After receiving the test results, Atom again contacted Applied Nano, requesting a quote for purchase of the instrument. Applied Nano sent a quote that offered a discounted price on the instrument, required payment to a Texas bank, and provided that the instrument would be shipped "FOB Houston." In response, Atom contacted Applied Nano to negotiate an even lower price on the instrument. Applied Nano did not agree.

Smolinski then contacted Applied Nano. Over a series of communications by telephone and email, Smolinski continued to negotiate the price of the instrument.

Eventually, the parties reached an agreement on the price. Applied Nano sent a quote that required an initial payment to be sent to a Texas bank, payment in full after shipping but before installation, and shipping "FOB Houston."

Atom then sent a purchase order for the instrument. The purchase order varied from Applied Nano's terms, according to an affidavit by Weisman, by making final payment due "30 days after the system [was] installed and ha[d] been 'fully examined.'" Applied Nano rejected this proposed change to the terms of the contract "because Atom was a new corporation without any established credit history."

Smolinski sent an email in response to Applied Nano's rejection. Weisman averred in his affidavit, "Smolinski responded to my email . . . by email represent[ing] . . . that despite being a new business, Atom was creditworthy, that it had already acquired a substantial amount of assets on credit, and that it intended to pay Applied Nano immediately after the installation of the Instrument." Smolinski attached to the email a revised purchase order setting final payment to be due after the instrument was fully installed and operating. Based on Smolinski's arguments and representations, Applied Nano agreed to Smolinski's revised term for final payment.

About four months after negotiations began, Atom sent the initial payment to the Texas bank, and Applied Nano began to manufacture the instrument. While Applied Nano manufactured the instrument, Atom sent six more samples to Applied

Nano for testing. Applied Nano analyzed the samples and sent the results to Atom. Once it was completed, Applied Nano shipped the instrument to Atom. Weisman flew to California to install the instrument, train the staff, and ensure the instrument was fully operational. Applied Nano then invoiced Atom for the remaining purchase price.

Shortly after installation, Atom experienced occasional error messages. Applied Nano determined that the error was likely caused by electrical interference from other instruments in the vicinity. To resolve this issue, Applied Nano ultimately designed and manufactured "an additional custom module for the Instrument." Applied Nano sent this module to Atom, and the error were resolved.

Atom did not send the final payment to Applied Nano. Smolinski provided explanations to Applied Nano for why Atom would not honor his promise that final payment would be made upon the instrument's installation and operation. Smolinski raised a number of objections, including the prices charged on components. Applied Nano responded to the objections, but Atom and Smolinski still refused to pay.

Applied Nano brought suit against Atom and Smolinski in Houston, Texas. Applied Nano asserted breach of contract and unjust enrichment claims against Atom. It asserted a fraud-in-the-inducement claim against both Atom and Smolinski.

Atom and Smolinski filed special appearances, asserting the trial court lacked personal jurisdiction over them. They attached a verified special appearance to their special appearances. Smolinski signed the verification, representing that three paragraphs of the special appearance were true and correct. Those three paragraphs provide,

> 2. Atom Nanoelectronics purchased equipment from Applied Nanofluorescence in April 2014. The negotiations for the purchase occurred by telephone and electronic mail. The parties have a dispute as to the suitability of the equipment, which was delivered to Atom Nanoelectronics in California.

> 3. Defendant Atom Nanoelectronics is not a resident of the State of Texas and has no purposeful contacts with this state. Atom Nanoelectronics is a Delaware corporation with its principal place of business in Inglewood, California. Atom Nanoelectronics does not do business in Texas. All business activity between the two companies occurred by telephone or electronic mail.

> 4. Defendant Kris Smolinski is not a resident of Texas and has no purposeful contacts with this state. He is an individual who does not do business in Texas and has no personal contacts with Applied Nanofluorescence. He resides in California.

Atom and Smolinski also attached an invoice from Applied Nano to their special appearance. The invoice does not apply sales tax. Instead, it provides, "Out-of-state sale, exempt from sales tax."

The trial court denied both special appearances. Atom and Smolinski initiated this appeal.

5

## Standard of Review

"Whether a court can exercise personal jurisdiction over nonresident defendants is a question of law, and thus we review de novo the trial court's determination of a special appearance." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010). When a trial court does not issue findings of fact or conclusions of law, "we presume that all factual disputes were resolved in favor of the trial court's ruling." *Aduli v. Aduli*, 368 S.W.3d 805, 813 (Tex. App.—Houston [14th Dist.] 2012, no pet.). "When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

## Applicable Law

"A nonresident defendant is subject to the personal jurisdiction of Texas courts if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction does not violate federal and state constitutional due process guarantees." *Kelly*, 301 S.W.3d at 657. Texas's long-arm statute extends a trial court's jurisdiction to the scope permitted by the federal constitution's due process requirements. *Id.* Under federal due process, a state can assert personal jurisdiction over nonresident defendants if they have "established minimum contacts with the forum state, and the exercise of jurisdiction comports with 'traditional

notions of fair play and substantial justice.'" *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)).

A party establishes minimum contacts with the forum state if it purposefully avails itself of the privileges and benefits of conducting business in a state. *Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 24 (Tex. App.—Houston [1st Dist.] 2010, no pet.). The scope of the nonresident's actions that can constitute purposeful availment varies depending on the type of jurisdiction alleged: general jurisdiction and specific jurisdiction. *See id.* at 24–25. Here, only specific jurisdiction is at issue. Accordingly, we only consider the law as it applies to specific jurisdiction.

A court has specific personal jurisdiction over a nonresident defendant if (1) the nonresident purposefully directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there and (2) the controversy arises out of or is related to the non-resident's contacts with the forum state. *Id.* at 24. Such a determination ultimately concerns the relationship among the nonresident, the forum, and the litigation. *Kelly*, 301 S.W.3d at 658. Certain considerations are relevant in this determination. First, only the nonresident's actions are relevant to the determination of purposeful availment; unilateral actions of the plaintiff or of a third party are not relevant. *Touradji*, 316 S.W.3d at 24. Also, the actions of the nonresident must be purposeful; random, isolated, or fortuitous

7

actions are insufficient. *Id.* Likewise, the nonresident's actions must seek some benefit, advantage, or profit through the purposeful availment so that the nonresident can be deemed to consent to suit there. *Id.*

We exclude from our consideration whether the nonresident did, in fact, commit a tort in Texas. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 791 (Tex. 2005). Otherwise, our jurisdictional rule would be "guilty nonresidents can be sued here, innocent ones cannot." *Id.* Instead, it is the alleged actions (as it pertains to the allegations in the pleadings) and the proven actions (as it pertains to the evidence presented) of the nonresident that matter, regardless of whether those actions are tortious. *See id.*

**Analysis**

Whether personal jurisdiction exists is determined by the nonresident's relationship to the litigation. *Kelly*, 301 S.W.3d at 658. As a result, personal jurisdiction is claim specific, meaning the trial court could have personal jurisdiction over a party for some claims but not for others. *See id.* at 660; *Touradji*, 316 S.W.3d at 25–26. If separate claims are based on the same forum contacts, however, we can review the claims together. *Touradji*, 316 S.W.3d at 26.

**A.** **Breach of Contract & Unjust Enrichment**

Applied Nano's breach-of-contract claim and unjust-enrichment claim invlove the same jurisdictional facts. Applied Nano asserted both claims against

8

Atom. In its response to the special appearance, Applied Nano included the affidavit of Weisman, Applied Nano's founder and president. In the affidavit, Weisman averred that Atom initiated contact with Applied Nano about the purchase of the NS3. Atom sent Applied Nano two samples for testing. Applied Nano conducted the tests and returned the samples.

Atom contacted Applied Nano again, seeking a quote to purchase the instrument. Applied Nano sent a quote that offered a discounted price on the instrument, required payment to a Texas bank, and provided that the instrument would be shipped "FOB Houston." Atom then contacted Applied Nano to negotiate an even lower price on the instrument. Applied Nano did not agree.

Later, Smolinski, Atom's CEO, called Applied Nano to further negotiate the price. The parties negotiated over a series of telephone calls and emails and eventually reached an agreement on the price. Applied Nano sent a quote that required an initial payment to be sent to a Texas bank, payment in full after shipping but before installation, and shipping "FOB Houston."

According to Weisman's affidavit, Atom responded by sending a "purchase order that varied the terms of Applied Nano's quote by stating that the balance would be paid net 30 days after the system [was] installed and ha[d] been 'fully examined.'" Applied Nano rejected this modification "because Atom was a new corporation without any established credit history." Weisman averred in his affidavit,

9

Smolinski responded to my email . . . by email represent[ing] . . . that despite being a new business, Atom was creditworthy, that it had already acquired a substantial amount of assets on credit, and that it intended to pay Applied Nano immediately after the installation of the Instrument. Smolinski attached a revised purchase order to his email which provided that payment would be made immediately after the Instrument was fully installed and operating.

Based on these representations, Applied Nano accepted the purchase order.

About four months after negotiations began, Atom sent the initial payment to the Texas bank, and Applied Nano began to manufacture the instrument. While Applied Nano manufactured the instrument, Atom sent six more samples to Applied Nano for testing. Applied Nano performed the analysis on the samples and sent the results to Atom. Once it was completed, Applied Nano shipped the instrument to Atom. Weisman flew to California to install the instrument, train the staff, and ensure the instrument was fully operational. Applied Nano then invoiced Atom for the remaining portion of the purchase price.

Shortly after installation, Atom experienced occasional error messages. Applied Nano determined that the error was likely caused by electrical interference from other instruments in the vicinity. Applied Nano ultimately designed and manufactured "an additional custom module for the Instrument" to resolve this problem. Applied Nano sent this module to Atom and the errors were resolved.

The Supreme Court of Texas has held that, while a single *contract* can satisfy the purposeful availment standard, it cannot be one that is based on a single *contact*.

10

*Michiana*, 168 S.W.3d 787. Here, we have repeated communications from Atom to Applied Nano negotiating the terms of the contract over a four-month period. In most of the circumstances, Atom initiated the contact, and Atom sought to persuade Applied Nano to accept changes to its normal pricing and contract terms. *See Holk v. USA Managed Care Org., Inc.*, 149 S.W.3d 769, 776 (Tex. App.—Austin 2004, no pet.) (considering repeated contacts from out-of-state defendant to in-state plaintiff seeking renewal of business as factor in establishing personal jurisdiction). Atom also shipped multiple samples to Texas for testing at least twice during the course of the transaction. *See Walden v. Fiore*, --- U.S. ---, ---, 134 S. Ct. 1115, 1122 (2014) (holding physical presence in state is not prerequisite to personal jurisdiction, but physical entry into the state by "goods, mail, or some other means" is relevant). The instrument Atom acquired was shipped from Texas to California, "FOB Houston." This indicates that title transferred to Atom in Texas. *See Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002) (holding FOB—free on board—means title passes at designated FOB point); *Command-Aire Corp. v. Ont. Mech. Sales & Serv. Inc.*, 963 F.2d 90, 94 (5th Cir. 1992) (considering state where title transferred as personal jurisdiction factor). The production of the instrument—the subject of the alleged contract—occurred in Texas. *See id.* (considering place where contract is to be performed as personal-jurisdiction factor, though noting that defendant's lack of control of location diminishes weight of

11

evidence). Atom sent its initial payment to a Texas bank, and the remaining payment was required to be sent to Texas. *See J.D. Fields & Co. v. W.H. Streit, Inc.*, 21 S.W.3d 599, 605 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (considering payments to Texas bank as personal jurisdiction factor, though noting that payment to Texas alone was insufficient).

In *Fields*, the Texas plaintiff contacted the New Jersey defendants (via the plaintiff's Pennsylvania office) by fax with a price list. *Id.* at 601. The defendant sent a purchase order to Pennsylvania. *Id.* The plaintiff declined to extend credit to the defendant based on a credit check. *Id.* The guarantor called the plaintiff in Texas and offered to personally guarantee the debt. *Id.* We held that "the most critical fact in this case . . . is that defendant guarantor telephoned plaintiff's Houston office with an offer to personally guarantee the defendant company's indebtedness in order to induce plaintiff to contract with defendant company." *Id.* at 604.

Here, Smolinski did not personally guarantee the debt. He did, however, contact Applied Nano and make representations assuring payment in order to induce Applied Nano to contract with Atom. We conclude this is significant. *See id.*

In contrast to this evidence, Smolinski filed a verification of his and Atom's special appearance, specifying that the facts asserted in three paragraphs of the document were true and correct. Sworn pleadings do not count as evidence, however. *See Laidlaw Waste Sys. (Dall.), Inc. v. City of Wilmer*, 904 S.W.2d 656,

12

660 (Tex. 1995) ("Generally, pleadings are not competent evidence, even if sworn or verified."); *CMC Steel Fabricators, Inc. v. Red Bay Constructors, Inc.*, No. 14-13-00084-CV, 2014 WL 953351, at \*8 (Tex. App.—Houston [14th Dist.] Mar. 11, 2014, no pet.) (mem. op.) (applying *Laidlaw* and rejecting consideration of sworn special appearance as evidence). Moreover, the paragraphs Smolenski verified as true contained only conclusory allegations that neither he nor Atom do business in Texas or have any "purposeful contacts with this state." *See Burke v. Satterfield*, 525 S.W.2d 950, 955 (Tex. 1975) ("[A]n affidavit is insufficient unless the allegations therein are direct and unequivocal and perjury can be assigned upon it."); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984) (holding affidavit must set forth facts that would be admissible in evidence, not simply assert legal conclusions).

Atom also attached an invoice from Applied Nano to its special appearance. Atom points out that the invoice stated, "Out-of-state sale, exempt from sales tax." Atom argues, "This provision is an admission that the sale was not consummated at a location in Texas." For authority, Atom relies on a provision of title 34 of the Texas Administrative Code concerning how to apply local sales taxes to in-state sales. *See* TEX. ADMIN. CODE § 3.334(g)(1), (h). The rule provides that a seller "is required to collect and remit local use taxes due, if any, on orders of taxable items shipped or delivered at the direction of the purchaser *into a local taxing jurisdiction in this state*." *Id.* § 33.334(g)(2) (emphasis added). Because the instrument was

13

delivered out of state—a fact not in dispute here—the provision upon which Atom relies does not apply.[1]

Applied Nano presented detailed evidence of Atom's connections to Texas. Atom presented no evidence to refute Applied Nano's evidence. We hold there is sufficient evidence to support the trial court's implied jurisdictional findings for Applied Nano's breach of contract and unjust enrichment actions.

## B.     Fraud in the Inducement

Applied Nano asserted its fraud in the inducement claim against Atom and Smolinski. In its petition, Applied Nano asserted that Atom and Smolinski made material misrepresentations to induce Applied Nano into entering into a contract for production of the instrument. Specifically, Applied Nano asserted that Atom and Smolinski's "representations that Atom intended to perform its agreement to pay the balance of the purchase price for the Instrument after installation of the Instrument" was material and false.

Most of the jurisdictional facts we have relied on for Applied Nano's breach of contract action took place during the formation of the alleged contract. Accordingly, these facts are also relevant to Applied Nano's fraud in the inducement claims against Atom. *See Touradji*, 316 S.W.3d at 26 (holding separate

---

[1]     Accordingly, we do not need to reach what impact, if any, Texas tax law has on personal jurisdiction determinations.

14

jurisdictional analysis is not required for separate claims based on same forum contacts).

For Smolinski, Weisman averred in his affidavit that Smolinski contacted Applied Nano each time Applied Nano rejected a requested modification to the proposed contract. First, when Applied Nano rejected Atom's request for further reductions on the price of the instrument, Smolinksi made repeated contacts with Applied Nano to negotiate the price terms. Eventually, Applied Nano acceded to Smolinski's arguments.

Second, when Applied Nano rejected Atom's request to make the final payment after installation and inspection,

> Smolinski responded to [Weisman's] email and Applied Nano's rejection of the purchase order in which he represented to Applied Nano that[,] despite being a new business, Atom was creditworthy, that it had already acquired a substantial amount of assets on credit, and that it intended to pay Applied Nano immediately after the installation of the Instrument. Smolinski attached a revised purchase order to his email which provided that payment would be made immediately after the Instrument was fully installed and operating.

Relying on Smolinki's representations, Applied Nano agreed to proceed with production of the instrument.

Weisman further averred that Smolinski provided explanations to Applied Nano for why Atom would not honor his promise that final payment would be made upon the instrument's installation and operation. Smolinski raised a number of

15

objections, including the prices charged on components. Weisman alleged that he rebutted each of the allegations, but Atom and Smolinski still refused to pay.

Each time negotiations between Atom and Applied Nano stalled, Smolinski contacted Applied Nano to further negotiate for Atom. *See Holk*, 149 S.W.3d at 776 (considering repeated contacts from out-of-state defendant to in-state plaintiff seeking renewal of business as factor in determining personal jurisdiction). Smolinski promised that Atom would pay upon installation and operation of the instrument and sent the revised purchase order to reflect this being part of the terms of the contract. *See Fields*, 21 S.W.3d at 604 (considering making personal representations to induce other party to agree to contract as factor in determining personal jurisdiction). Smolinski's representations and arguments sought to induce a contract that would largely be performed in Texas. *See Command-Aire*, 963 F.2d at 94 (considering place where contract is to be performed as personal-jurisdiction factor, though noting that defendant's lack of control of location diminishes weight of evidence).

Atom and Smolinski did not present any evidence to rebut or diminish Applied Nano's jurisdictional evidence. We hold there is sufficient evidence to support the trial court's implied jurisdictional findings for Applied Nano's fraud in the inducement claims against Atom and Smolinski. We overrule Atom and Smolinski's sole issue.

## Conclusion

We affirm the trial court's order denying Atom's and Smolinski's special appearances.

Laura Carter Higley
Justice

Panel consists of Justices Higley, Bland, and Massengale.